Pat Wolfforth v. The State.

*No. 526. Decided December 17.*

1. **Change of Venue—Sufficiency of Transcript and Clerk's Certificate Thereto.**—It is provided by article 585, Code of Criminal Procedure, that "when an order for change of venue has been made, the clerk of the court where the prosecution is pending shall make out a true transcript of all orders made in the cause, and certify thereto under his official seal, and shall transmit the same, together with all the original papers in the case, to the clerk of the court to which the venue has been changed." *Held*, that no particular form of certificate is prescribed by the statute, nor does it require a caption as part of the transcript. It is only required that the orders which have been made shall be certified. The number of pages containing such orders constitute no part of the same.

2. **Same — Recognizance of Witness. —** The transcript on change of venue omitted the recognizance of a recognized witness. *Held*, on motion to strike out the transcript, that the authority of the court to supply the omission should have been invoked, which was ample. It further appearing that the witness involved in the recognizance was present at the trial, no possible injury could have accrued to the defendant. The motions were properly overruled.

3. **Continuance.**—The application for a continuance not only shows total want of diligence, but it further appears from the other evidence that the proposed testimony was not true. *Held*, that the continuance was properly refused.

4. **Manslaughter—Charge of Court.**—The causes which reduce a killing from murder to manslaughter must be those which operate on the mind of the slayer at the time of the homicide, and the charge of the court should be confined to the cause or causes which are shown to have created the passion. It would be erroneous to charge upon a state of facts which could not possibly have operated upon or influenced the mind of the defendant at the time of the homicide.

5. **Same — Insulting Conduct to Wife of Accused — Resistance to Arrest.**—Where the wife testified that her husband had informed her that he had met deceased several times after she had informed him of the insulting conduct toward her prior to the homicide, *held*, that manslaughter predicated upon such insults was not involved in the case; and further, that there being no evidence that at the time of the homicide the defendant as sheriff was seeking to arrest deceased, the court did not err in refusing to charge the law with reference to such supposed state of facts.

6. **Error in Charge to Defendant's Benefit.**—The court in its charge upon manslaughter having instructed upon a theory of the defense which was not really involved in the case, and which redounded to defendant's benefit, and doubtless induced the infliction of a milder punishment, he can not be heard to complain.

7. **Preliminary and Prefatory Statements in Charge of Court.**—In the prefatory paragraph of the charge the court stated to the jury the nature of the accusation against the defendant, and added in that connection, "and in determining the defendant's guilt or innocence of said charge I give you the following instructions," etc. It was objected to the language used, that it submitted the defendant's "innocence" as an issue in the case. *Held*, that the objection was not well taken, the preliminary statement not being a part of the charge of the law properly applicable to the case. McGrew v. The State, ante, p. 336.

8. **Competency of Witness of Tender Years.**—On a trial for murder it was objected to the competency of a witness (a boy who at the time of the trial stated that he was then thirteen years of age), that he was too young, and not of sufficient intelligence to understand the nature and obligation of an oath. But *held*, that the record disclosing the witness to be an intelligent person, with capacity sufficient to understand the nature and obligation of the oath administered to him, he was properly held competent to testify on the trial.

9. **Charge of Court—How Construed.**—In construing a charge of the court all of its provisions must be considered together; and if, taken as a whole, the charge sufficiently presents the law of the case, it will be sufficient. See this rule applied where an objection to the court's instruction in relation to homicide committed in discharge of official duty was "that it excluded the theory of the defense that the homicide was committed in defense of a female relative, and on the first meeting after the insult;" and furthermore, because "such instruction intimated that the court did not believe such testimony of the defense upon the latter theory." The objections were properly overruled as not maintainable.

10. **Requested Instruction—Self-Defense.**—In the absence of evidence which justified the theory that the deceased made an attack on the defendant, the court did not err in refusing a special requested instruction submitting the theory of self-defense. based upon such a supposed state of case.

11. **Improper Remarks of Counsel—Practice with Regard to.**— See the opinion for remarks imputed to counsel which if used were legitimate, but if improper and calculated to injure defendant's rights devolved upon him prompt exception and contemporaneous motion for withdrawal from the jury. In default of such exception and motion defendant can not complain on appeal.

12. **Murder of the Second Degree.**—See the statement of the case for evidence *held* sufficient to support a conviction for murder in the second degree. .

APPEAL from the District Court of Wilbarger, on change of venue from Hall. Tried below before Hon. G. A. BROWN.

Appellant was indicted at the November Term, 1891, of the District Court of Hall County, for the murder, in that county, on the preceding August 10, of Eugene De Borenfiend. At the May Term, 1892, of the District Court, the judge, of his own motion, changed the venue from Hall to Wilbarger County. The case was called for trial on the 6th day of August, 1892, in the District Court of Wilbarger County; whereupon the appellant objected to the transcript of the record of proceedings had in the District Court of Hall County, upon the ground that it was without a sufficient caption, or certificate of the district clerk of Hall County identifying the same, as required by law; and he moved to dismiss the case because of the insufficiency and uncertainty of the record transferring it to the District Court of Wilbarger County. He also specially pleaded under oath, denying the jurisdiction of the District Court of Wilbarger County to try him upon such doubtful record. The motion to dismiss and the plea to the jurisdiction were overruled by the court, to which rulings the appellant reserved his bills of exception.

At this stage of the trial the defendant filed his written statement, to the

effect that he had not been served with a copy of the indictment against him, and moved for two days' service of the same before being arraigned for trial. This motion the trial court overruled, upon the ground that the defendant was not in confinement but was on bail when the indictment was returned into the District Court of Hall County, and was subsequently taken into custody on said indictment. The defendant then made his application for first continuance, which, being overruled, he took his bill of exceptions. He was then placed upon trial, and was convicted for murder of the second degree, his punishment being assessed at a term of fifteen years in the penitentiary.

Dr. S. McReynolds was the first witness for the State. He testified, in substance, to the character of the four wounds he found on the person of the deceased after the shooting. Two of those wounds were in the left breast, and two in the right side. Either of two of those wounds would have necessarily produced death. On the evening of the shooting, August 10, 1891, the witness was called to see the defendant, and found him suffering with a superficial wound in the upper part of the left breast. That wound was made, apparently, by a ball of 32-calibre. The deceased died on the morning of August 11, 1891, in Hall County, Texas, from the effects of the gunshot wounds described.

Charley Brice testified, for the State: That he lived in Memphis, Hall County, Texas, and lived at that place at the time of the homicide, which occurred on the evening of Saturday, August 10, 1891. The witness saw part of a difficulty between the defendant and deceased on the Friday evening preceding. Witness was standing behind the counter in his drug store, when his brother Bert called to him to " look out." Witness stepped toward the front door just as the deceased entered. As he entered, or just before, deceased remarked to some person witness did not then see, "I did not think you would get mad at that." As he passed witness, going to the rear of the drug store, deceased remarked, "The d—d son-of-a-bitch slapped me." He did not call the name of a person. Previous to this time the witness did not hear defendant say anything. Defendant was passing the front door of the drug store, going east, when witness reached that point. About that time deceased came back to the front door, and he and defendant, the latter without stopping in his leisurely walk, began cursing each other as d—d sons-of-bitches. Deceased, in the course of this quarrel, said to defendant, " I will put what I d—d please in the paper." Defendant said to deceased, " You have listened to them d—d rascals." The witness did not know who began this quarrel, but each " kept up his end of it." Bert Brice testified, in substance, as did this witness.

At this stage of the trial the State introduced in evidence the following diagram of the postoffice building in Memphis, Hall County, Texas, in which the shooting occurred:

J. C. Finger was the next witness for the State. He testified, in sub-stance, that he witnessed in part the difficulty which resulted in the homi-cide on trial. About sunset on the fatal afternoon, he, in company with Finch and the deceased, were seated on the gallery in front of the post-office, which adjoins a restaurant, in Memphis, Hall County, Texas. Mr. Webster was seated in a chair just off the gallery, facing the witness, Finch, and deceased. The witness occupied a position immediately in front of the double door of the postoffice room, with deceased next on his left-and Finch on his right. Defendant, on horseback, approached the party in a lope, and was very near before the witness saw him. Witness, Finch, Webster, and deceased got up at once, and the latter passed into the postoffice. Defendant, on reaching the gallery, dismounted and passed into the postoffice building behind deceased. As he went through the door he threw his hand to his hip pocket as if to draw a pistol, and ex-claimed, "You damned son-of-a-bitch" or "You God damned son-of-a-bitch." Witness then walked down the gallery. The last he saw of the parties, defendant was stepping through the door into the postoffice room, and deceased was about eight feet beyond the door, in the room, with his back toward defendant, walking away from him, and looking back at him over his shoulder. The witness did not see any shots fired, but heard five or six. The first shot was a loud, and the second a much fainter re-

port. Immediately after the shooting defendant got on his horse and rode off toward the depot. Witness then went into the postoffice, and looking through the delivery window, saw the deceased inside, lying down, and Finch adjusting his body. Defendant could have shot the deceased at any time after the witness first saw him as he rode up. The witness did not know where Finch and Webster were during the shooting.

J. J. Woodward testified, for the State: That he was standing on the southeast corner of the gallery at Fore's store at the time the fatal shooting occurred. That store was on the west side of the public square in Memphis, and was distant from the postoffice the width of the square and two intervening parallel streets. The ground between Fore's store and the postoffice was nearly level, with a downward grade, and nothing between to obstruct the view. While standing on that gallery the witness saw the defendant loping his horse from the direction of Wilkerson's saloon, on the northwest corner of the square, toward the postoffice. When he reached the postoffice he dismounted, threw the reins over his horse's head, drew his pistol, went into the postoffice, and walked toward the southeast corner of that room, and fired in the direction of the east door of that room. That shot was followed by a fainter report. Defendant then walked to the money order window of the postoffice and fired three shots through that window into the postoffice. He then started out of the house, but went back to the window and looked through. He then left the house, got on his horse, and rode off.

After the first shot was fired the witness started rapidly across the square to the postoffice. En route he met Hodge and Pardue, and stopped to ask them who had been shot. Hodge replied that he knew nothing and wanted to know nothing about the shooting. Pardue said nothing. Witness saw Finger, Webster, Finch, and Altizer on the gallery, and saw deceased retreat into the postoffice when defendant rode up. Witness left Summers at Fore's store, and did not see him at the postoffice. Finch was standing on the postoffice gallery when the shooting began. Finger went north when the shooting began, Webster south, Altizer toward Forgy's hotel, and Finch toward Padgett's office. Whether or not Finch then went into the postoffice the witness was unable to say.

County Judge Altizer testified, for the State: That he was on his way from Forgy's hotel to the postoffice when he saw defendant loping his horse across the square towards the postoffice. The witness had nearly reached the corner of the gallery of the postoffice building when defendant passed near enough for him to observe a very determined look in his eye. As defendant approached the postoffice a small party sitting on the gallery separated, the deceased going into the postoffice. Defendant dismounted, and followed deceased into the postoffice, drawing his pistol as he went in at the door, and saying something the witness did not understand. The witness then turned and went back to Forgy's hotel, and a

moment later heard the shooting. The first two shots—the first much the heaviest report—were fired in rapid succession; the others after an interval. Finch was standing on the gallery when the shooting began.

Lula Robertson testified: That she was standing in the door of the restaurant kitchen when the shooting took place. She only saw the first shot fired, and that shot was fired by the defendant. After the shooting she saw deceased lying on the postoffice floor. Finch, who was with him, picked up a pistol from the floor and placed it on a table.

Ed F. Finch testified, for the State: That he saw the fatal difficulty, and corroborated the witness Finger up to the point when defendant followed deceased into the postoffice. As the defendant entered the postoffice door he drew his pistol and exclaimed, "You damned" or "God damned son-of-a-bitch, I have got you now!" He then fired from near the southeast corner toward the east door of the postoffice. The witness then saw the deceased through the money order window trying to shut the postoffice back door. The defendant then went to the money order window, through which he fired three more shots at deceased. Deceased fell at the first or second shot which was fired through the window. He said something as he fell, but witness was not certain as to the words. As he understood them they were, "Don't shoot me any more; you have already killed me." After firing the third time through the window, the defendant started to leave the house, but went back and looked through the window. He then left the house, got on his horse, and rode off.

When defendant left, the witness, who had stood during the time on the gallery in front of the postoffice, went into the postoffice and found deceased lying on the floor on his side. He turned deceased over to rest on his back, when deceased said to him, "I am killed; can't you do something for me?" About that time witness observed and picked up a small pistol from the floor. Examination showed that three shots had been fired from it. Deceased made a declaration before he died, which was reduced to writing.

At the conclusion of the testimony of the witness Finch, the State read in evidence the dying declarations of the deceased, as follows: "I published the County Court proceedings in my paper, and published that cases against Pat Wolfforth were dismissed. He walked up to me at Brice's drug store, Friday, August 9, 1891, and said, 'You God damned son-of-a-bitch, what did you put that in your paper for?' He slapped my face, and I ran into the drug store. This evening he rode up to the postoffice where I was sitting. He got down from his horse and said, 'You damned son-of-a-bitch,' and pulled his pistol and began shooting as I ran into the house. He said, 'You damned son-of-a-bitch, you cursed me.' After he shot, I pulled my pistol, shot, and fell in the postoffice. Pat kept shooting me. I do not think I can get well. I am suffering death with my leg. O! do something for me! Pat Wolfforth killed me."

The testimony of Mrs. Hendrix, who placed herself in a position to see and hear what transpired, fixed the first shot as fired by the defendant soon after he followed the deceased into the postoffice. The State rested.

Postmaster Robertson was the first witness for the defense. He testified, in substance, that he was in the postoffice, wrapping up mail matter, when the shooting occurred. Witness saw the defendant when he rode up to the postoffice door. About that time the deceased came into the postoffice, and took a position in front of the delivery window, facing the door. If he said anything when defendant came into the postoffice, witness did not hear it. Defendant said something, which witness did not understand. As he passed the delivery window, and for a moment out of witness' sight, deceased ran into the postoffice business department, and closed the door. He then drew a pistol from his hip pocket, presented it with both hands, and fired through the door—firing the first shot heard or seen by the witness. The first two shots were fired very nearly together. Defendant was then out of witness' sight. As many as three shots were fired at the door. After these shots were fired, deceased peeped through a small opening of the door, and about that time defendant fired three shots through the money order window. Deceased fell at the first of those three shots. The defendant then left. If he returned to the money order window, the witness did not see him. Before firing the second shot through that window, the defendant was asked by the witness not to shoot any more, but witness could not say that he heard the request. William Lineberger, a cook in the restaurant at the time of the shooting, was standing at the window between the kitchen and dining room. Defendant, at the time of the shooting, was sheriff of Hall County.

The material part of the testimony of J. C. Montgomery, for the defense, was, that in his opinion the body of a man as large as defendant, standing in front of the money order window of the postoffice at Memphis, Texas, would so completely cover it that a person standing where the State's witness Finch says he stood during the shooting, could not see said window, nor through it into the postoffice.

C. H. Hodge was the next witness for the defense. There was nothing material about his testimony, except his denial that on meeting Woodward he made the statement imputed to him by Woodward, and that from the sound of the reports of the first shots it was evident to his mind that the first that was fired was from a pistol of smaller calibre than that from which the second shot was fired.

A. L. Thrasher, the next witness for the defense, placed the State's witness Finch, throughout the shooting, at the southeast corner of the restaurant gallery, a position from which he could not possibly have seen into the postoffice. The defense witness Lafferty's testimony was to the effect that there was no person on the gallery in front of the postoffice

while the shooting was going on.   The testimony of Miss Sophronia Lafferty described the State's witness Finch as fleeing from the direction of the shooting while it was in progress, and in positions from which at no time during the period could he have seen into the postoffice.

J. C. Holmes, editor of the Hall County Record, testified for the defense:   That he examined the proceedings of the Hall County Court for the week preceding the shooting, and found that gaming cases against the deceased, the defendant, and many others had been dismissed.   Before the Record came out that week witness received a note from deceased, who was editor of the Hall County Herald, requesting him, on account of his (deceased's) family, not to publish his case among the others.   Witness did not publish any of the proceedings, but when the Herald came out he found the proceedings as to the case against defendant published therein, but nothing about the case of the deceased or others.

The testimony of Byron Jones and W. M. Fore, for the defense, described the witness Finch as fleeing from the direction of the postoffice and towards Padgett's office during the entire time of the shooting after the first shot, and as not standing, as he testified, in front of the postoffice door.   Fore's evidence also placed the State's witness Woodward inside of his (Fore's) store when the first shot was fired, instead of at the corner of the sidewalk on the outside, as he (Woodward) had testified.

J. P. Mitchell testified for the defense:   That late on the evening of August 8, 1891, the deceased overtook him near the railroad track in Memphis, and said, "Mitch, an Irish son-of-a-bitch slapped me in the mouth, and you mark my words, I will kill him for it."   He then told witness that defendant was the man he alluded to.

John Miller testified, for the defense:  That while he and deceased were playing billiards on the morning of the fatal day, defendant passed through the room.   Referring to defendant, deceased said:  " There is a man I am going to kill if he ever lays a thing in my way.   I have had a scrap with him, and I mean to kill him if he ever gives me a chance."

The material fact testified to by H. W. Farmer, the defendant's next witness, was that one evening between the 1st and 10th days of August, 1891, he heard the deceased, whom he then did not know, tell another man that the defendant had slapped his face and that he intended to kill him; that no man could slap his face and live in Memphis, and that he, deceased, would put what he damned please in his paper.   Witness on the next day told defendant of the threat he had heard deceased make against his life, and advised him to " look out."

J. B. Abbott testified, for the defense:   That late on the afternoon of the fatal day he wrote out for the defendant, who was manager of Sam Lazarus' Hall County ranch, a statement of the business; placed that statement in an envelope addressed to Sam Lazarus at Sherman, and gave

it to defendant to mail.    Defendant rode off toward the postoffice, and the shooting took place soon afterwards.

The substance of the testimony of the defendant's wife is gleaned from the brief of the appellant's counsel, as follows:  " I am the wife of the defendant.    We were married in Fort Worth in 1887.   On Saturday preceding the shooting my husband and myself drove from home to town in a buggy.    About 4 o'clock in the evening my husband stopped at Abbott's store, telling me he was going to Giles on the evening train to ship some cattle.    He went on the train to be gone two or three days.   I went to the country to visit William Ball's family; returned just after train time, between sundown and dark.   The deceased came out of his printing office, and as I drove along in the, rear of the office he called to me.    I stopped the buggy, and he came up and commenced talking to me.    He asked where my husband was.    I told him he was at Giles.   He asked me how long he was to be gone.    I told him two or three days.   He then proposed that he would come to my house that night to see me.    I told him I was not that kind of a woman, and drove off and left him.    The next morning I went to see my husband to tell him what the deceased had done, but I did not get to see him.    I sent him word to come home as soon as he could.    He came on Monday, and I told him what the deceased had done, and he killed the deceased on that day.    He seemed very angry, and said he would see about it."

On cross-examination this witness testified, in reply to questions, that after the homicide the defendant told her that he met the deceased once or twice after learning from her of the insults testified to, and before the shooting.   The witness did not testify on either of the habeas corpus trials of her husband, though she then knew the facts to which she has now testified.    It was on the day after the first difficulty that deceased made his insulting proposition to the witness.

J. R. Bean testified, for the defense:    That he met the defendant leaving the postoffice immediately after the shooting, and observing that he was bleeding profusely at the breast, offered to assist him.    Defendant said, " If I had not knocked his pistol down just as he fired he would have shot me in the eye and killed me.   I am killed anyhow."

Several witnesses, testifying for the State, in rebuttal, placed the State's witness Finch on the gallery in front of the postoffice from the time immediately after the first shot was fired until after the defendant left.   The proof showed that the pistol used by the defendant was a large Colt's 45-calibre, and that used by deceased a small 32-calibre Smith & Wesson.

*G. W. Walters* and *Hare, Edmundson & Hare,* filed an able and exhaustive brief for the appellant.

*R. L. Henry,* Assistant Attorney-General, for the State.

DAVIDSON, Judge.—Appellant was indicted in Hall County for murder.   At the May Term of the District Court of that county, the judge, of his own motion, transferred the cause on change of venue to Wilbarger County.   When his case was called for trial in the latter county, appellant moved to strike out the transcript sent from the District Court of Hall County to the District Court of Wilbarger County, because it did not contain either a sufficient caption or certificate, and because it did not contain all the orders made and entered in the District Court of Hall County, in that it omitted the recognizance of a witness who had been recognized as such in that county.   The same questions are raised in a plea to the jurisdiction of the District.Court of Wilbarger County.   These motions were overruled, and will be treated together.

1.  The statute provides:  " When an order for a change of venue has been made, the clerk of the court where the prosecution is pending shall make out a true transcript of all orders made in the cause, and certify thereto, under his official seal, and shall transmit the same, together with all the original papers in the case, to the clerk of the court to which the venue has been changed."   Code Crim. Proc., art. 585.

The statute prescribes no particular form for the certificate of the clerk, nor does it require a caption as a part of the transcript.   The objection to the certificate is that it fails to state the number of pages contained in the transcript.   While perhaps it may be the better practice to include a caption in such transcripts, as well as insert the number of pages to which such certificate is attached in such certificate, still such omission will not be fatal.   Under the statute it is only required to certify the orders which have been made.   The number of pages does not constitute any portion of such orders.

The court did not err in overruling both pleas.   Had it become necessary to have the omitted order, the District Court of Wilbarger County was not without authority to supply its omission, and if desired, this power of the court should have been invoked to obtain it.   The court has a right to have a complete and correct transcript of all the orders entered in the court from which the cause is transferred, and is not without authority to secure the same.   It is not shown why this order was desired, or even that it was desired.   It could only be useful in connection with and affecting the question of diligence to secure the attendance of the witness at the trial, and to place the recognizance in court for the purpose of forfeiture in case of his default to so appear.   To this it may be answered, that the witness appeared at the trial, and no injury is made to appear, and none sought to be shown.   Brown v. The State, 6 Texas Ct. App., 286.

2.  Appellant presented his application for continuance on account of the absence of several witnesses, all of whom appeared at the trial, except Lineberger, and for him there was no pretense of diligence.   In ex-

plaining the bill of exceptions taken to his action in overruling this application, the court said, with reference to the evidence of this witness: "I have twice heard the testimony in this case on defendant's application for bail. I am of opinion that the allegations as to what defendant would prove by such witness are not true." From an inspection of the record, we concur with the judge in this view of the matter. The court did not err in refusing the continuance.

3. The court charged the law of manslaughter applicable to a state of case involving insulting language and conduct by deceased towards the wife of appellant, as well as to a supposed state of case showing deceased's resistance to an attempted arrest sought to be made by the defendant as sheriff, for unlawfully carrying a pistol. It is also insisted that the law of manslaughter should also have been given with reference to a combination of circumstances occurring prior to and at the time and scene of the difficulty, which were capable of creating and did create "such passion" as would reduce the killing from murder to manslaughter.

We do not concur in this view of the testimony. It is too well settled in this State to be questioned, that when the law of the case has been given in charge it is sufficient. This applies as well to manslaughter as other grades of homicide. The causes which reduce a killing from murder to manslaughter must be operative in the mind of the slayer at the time of the homicide, in order to bring the killing within the purview of our statutes relating to that offense. The passion must not only exist, but the "cause" relied on must also be shown, and the charge should be confined to the "cause" or causes which are shown to have created the passion. An instruction upon matters not shown by the evidence is not required, and should not be given. If defendant killed the deceased because of insulting conduct toward his wife, it would be difficult to perceive why the court should be required to charge with reference to "adequate cause," produced by "an assault and battery causing pain or bloodshed." It would be equally as hard to understand why the law applicable to another phase of manslaughter than that made by the testimony should be charged. It would be equally as incomprehensible to understand why the law applicable to any nonexisting state of facts should be required in the charge. Such absent facts could not possibly operate upon or influence the mind of a defendant at the time of the homicide, and a charge thereon could not be "the law of the case."

Although given by the court, the law of manslaughter, with reference to insulting conduct by deceased towards appellant's wife, was not involved in this case, because the wife, who alone testified in regard to the insults, also swore that defendant had informed her of the fact that he had met deceased several times subsequent to being informed of such conduct, and prior to the homicide. Nor was the charge with reference to

deceased resisting arrest called for, because the testimony excluded such a theory.

While it is true that defendant was sheriff of the county, there is not the slightest evidence tending to convey the idea that he was seeking to make or that deceased was resisting such arrest. The acts, conduct, and declarations of defendant at the time of the homicide, taken in connection with prior occurrences, discard such theories, and lead to the conclusion that the killing was not brought about by resistance to arrest, nor on account of deceased's insulting conduct towards appellant's wife. The facts disclose that defendant rode rapidly to where deceased and a friend or two were sitting on the gallery of the postoffice building. Seeing defendant approaching them, and anticipating trouble, they moved away. The deceased fled into the postoffice, and his friends in different directions. Defendant jumped from his horse, followed deceased into the postoffice, and pulling his pistol as he entered the room, remarked to deceased, "You damned son-of-a-bitch," or "You God damned son-of-a-bitch, I have got you," and began firing upon deceased just as he escaped through an inner door into the postoffice apartment of the building. He then went to the money order window of the office, and through it shot deceased several times, and after so shooting him, retired from the building, mounted his horse, and rode off. The parties had had some previous difficulties because of an item published in a newspaper edited by deceased, reciting the fact that a gaming case against defendant had been dismissed from the docket of the court.

The law of manslaughter was not involved in this state of case, nor in any of the facts adduced in evidence. The error of the court in giving in charge the law of manslaughter upon the theories mentioned in the instructions redounded to defendant's benefit, and doubtless induced the verdict inflicting the milder punishment of murder in the second degree, when the facts would have supported the heavier punishment for murder in the first degree. But of this he can not be heard to complain, and in fact does not complain.

4. In writing his charge, the court, before giving the instructions proper, stated the nature of the charge against defendant to the jury, and in this connection further said: "And in determining the defendant's guilt or innocence of said charge, I give you the following instructions as the law applicable to the case, and by which you must be governed." It is contended that the above statement of the nature of the case submits the defendant's innocence as an issue in the case. The point is not well taken. It was not a part of the charge, but simply a preliminary statement of the nature of the accusation against defendant. McGrew v. The State, ante, p. 336.

5. The witness Bert Brice is not shown to have been an incompetent witness. By the record it appears that his capacity was sufficient to un-

derstand the nature and obligations of the oath administered to him as a witness, and his evidence discloses him to have been an intelligent witness.

6. The court charged the jury, among other things, in appropriate terms, that if defendant sought, without having a warrant for that purpose, to arrest deceased for unlawfully carrying a pistol, and deceased resisted such arrest, and "it became necessary for him to kill deceased to prevent injury to himself, and you believe from the evidence that defendant killed deceased in the discharge of his official duty to arrest him, then you will acquit the defendant." The court further charged upon this subject, and in immediate connection with the foregoing paragraph, "that if he was not actuated by an intent to arrest deceased for a violation of the law, and if you do not believe that defendant killed deceased in his own self-defense, as hereinbefore charged, and you do believe that defendant killed deceased with his malice aforethought, express or implied, then the defendant will be guilty of murder in the first or second degree, as the evidence will show, subject, however, to the following instructions." Then immediately followed the law upon manslaughter, based upon the insulting conduct of the deceased towards the wife of defendant.

The charge quoted is objected to, because " it excludes the idea of the theory of the defense that the homicide was committed in the defense of a female relative on the first meeting after the insult to the wife;" and because by such instruction the court intimated that he does not believe the testimony of the defense upon that theory of the case.

These objections are not well taken. On the contrary, the charge in relation to the question of arrest is given expressly subject to the charge on manslaughter, with reference to the insulting conduct and language mentioned. In construing a charge all of its provisions must be considered together, and if, taken as a whole, the charge sufficiently presents the law of the case, it will be sufficient. Again, as before stated, the facts did not call for either of the charges submitting the issue of manslaughter, nor do they call for a charge on this phase of the law from any view of the evidence; and inasmuch as such charges were given, they doubtless influenced the jury to impose the milder punishment for murder in the second degree, and were therefore beneficial to the defendant. The charge given was more favorable to the defendant than the facts required or authorized.

7. The court did not err in refusing the special requested instruction submitting the theory of self-defense from the standpoint that the deceased made the attack on defendant. There is no evidence in the record before us to justify such a charge.

8. Defendant's bill of exceptions No. 4 recites that S. P. Huff, of counsel for the State, during the trial, to the jury said: " The defendant

is a murderer in cold blood, an assassin. · He applied to the court for bail and was refused; and if this evidence is true, why did he lie in jail since last December and not make use of it?''

The court refused this bill, because he did not hear the language imputed in which counsel called defendant a murderer and an assassin, and his attention was not called to it by defendant or his counsel.  Further explaining this matter, the court says:  ''Attorney Huff did not say that defendant had applied for and was refused bail, etc.  But this remark was made in discussing the weight which should be given to the testimony of defendant's wife, who testified, without objection, that she was present in court when defendant applied for and was refused bail, but she did not testify on his trial for bail.  Defendant's counsel made no objection at the time to the above remarks of attorney Huff.''  Recurring to the statement of facts, it is recited that the defendant's wife testified:  '' There have been two habeas corpus trials trying to get bail before now.  My husband was denied bail.  My husband was allowed bail on the first habeas corpus trial, but not in the second application after indictment.  Yes, I knew these facts all the time, and was present in court when my husband was tried on habeas corpus, but did not testify; and my husband was refused bail and has been in jail for six months, and I have never told any one except as above mentioned.''  If the remarks imputed to counsel with reference to this testimony were used, they were legitimate; but if the remarks were improper and calculated to injure defendant, prompt exception should have been interposed and necessary requests made looking to their withdrawal from the jury, which was not done. Young v. The State, 19 Texas Ct. App., 536; Kennedy v. The State, Id., 618; Weathersby v. The State, 29 Texas Ct. App., 278; Rahm v. The State, 30 Texas Ct. App., 310; Williams v. The State, 30 Texas Ct. App., 354; Tipton v. The State, 30 Texas Ct. App., 530; Gonzalez v. The State, 30 Texas Ct. App., 203; Frizzell v. The State, 30 Texas Ct. App., 42; Willson's Crim. Proc., sec. 2321.

We can not concur with counsel that the verdict is unsupported by the testimony.  On the contrary, the evidence before us would have justified a verdict imposing a higher punishment, and even a conviction for the higher grade of the offense charged.  Finding no error requiring a reversal, the judgment is affirmed.

*Affirmed.*

Judges all present and concurring.