## WALTER PRATT V. THE STATE.

No. 241.    Decided March 30. 1910.

Rehearing denied May 4, 1910.

**1.—Murder—Charge of Court—Murder in the Second Degree—Unlawful Killing.**

Where, upon trial of murder, the court, in applying the law of murder in the second degree, charged the jury that if the killing was not done under the immediate influence of sudden passion produced by an adequate cause, and was not in defense of accused against an unlawful attack, or what to him might have reasonably appeared an unlawful attack producing in his mind a reasonable expectation or fear of death or some serious bodily injury, to find the defendant guilty of murder in the second degree (the court having correctly defined murder in the second degree and charged on self-defense), the same was sufficient although the phrase that the killing must be unlawful and upon malice was omitted in applying the law of murder in the second degree to the facts. Following Puryear v. State, 56 Texas Crim. Rep., 231.

**2.—Same—Charge of Court—Self-Defense.**

Where, upon trial of murder, the court's charge on self-defense sufficiently directed the attention of the jury to the facts in the case, it was not essential that the court should have undertaken to embody the details of every fact relied on by the defendant to sustain his plea of self-defense.

**3.—Same—Charge of Court—Manslaughter.**

Where, upon trial of murder, the evidence did not raise the issue of man-. slaughter, but the court nevertheless submitted this grade of homicide in a proper charge. there was no error.

**4.—Same—Means Used by Deceased.**

Where, upon appeal from a conviction of murder, the appellant complained of the court's failure to give in charge to the jury article 676, Penal Code, with reference to the means used by the deceased, but this issue was in no way raised either by bill of exceptions or on motion for new trial, the same could not be considered.

**5.—Same—Sufficiency of the Evidence.**

Upon trial of murder where the evidence amply sustained a conviction of murder in the second degree, the same will not be disturbed.

Appeal from the District Court of Stephens. Tried below before the Hon. Thomas L. Blanton.

Appeal from a conviction of murder in the second degree; penalty thirty-five years imprisonment in the penitentiary.

The opinion states the case.

*W. P. Sebastian* and *W. C. Veal* and *D. G. Hunt,* for appellant.— Upon question of insufficiency of the evidence: Bonner v. State, 29 Texas Crim. App., 223; Hawthorne v. State, 28 Texas Crim. App., 212; Orman v. State, 24 Texas Crim. App., 495; Childers v. State, 33 Texas Crim. Rep., 509.

On question of court's charge on murder in the second degree: Abbata v. State, 51 Texas Crim. Rep., 510, 102 S. W. Rep., 1125; Swain v. State, 48 Texas Crim. Rep., 98, 86 S. W. Rep., 335; Clark v. State, 51 Texas Crim. Rep., 519, 102 S. W. Rep., 1136.

On question of self-defense: Robinson v. State, 30 Texas Crim. App., 459; Burkhard v. State, 18 Texas Crim. App., 599; Meuly v. State, 26 Texas Crim. App., 274; Bell v. State, 17 Texas Crim. App., 538; Jones v. State, 17 Texas Crim. App., 602; Hobbs v. State, 16 Texas Crim. App., 517; Howard v. State, 23 Texas Crim. App., 265; Swain v. State, 48 Texas Crim. Rep., 98, 86 S. W. Rep., 335; Carson v. State, 57 Texas Crim. Rep., 30, 123 S. W. Rep., 590; Huddleston v. State, 54 Texas Crim. Rep., 93, 112 S. W. Rep., 65; Kendall v. State, 8 Texas Crim. App., 569.

On question of court's charge on manslaughter: Wadlington v. State, 19 Texas Crim. App., 273; Childers v. State, 33 Texas Crim. Rep., 509.

*John A. Mobley,* Assistant Attorney-General, for the State.

RAMSEY, JUDGE.—On the 7th day of June, 1909, the grand jury of Stephens County returned an indictment against appellant charging him with the murder of one M. C. Barron by then and there shooting him with a gun. During the same month he was on trial, found guilty of murder in the second degree and his punishment assessed at confinement in the penitentiary for a period of thirty-five years.

The deceased, M. C. Barron, was a farmer living in Stephens County, and, according to the testimony, the owner of considerable lands in that county. He was a man in middle age or past, with a large family of children. The appellant was a man about thirty years of age and had, not long before the killing, married deceased's daughter, whom he had known something like a month or two before the marriage. On the day of the killing, which was on Tuesday, the 16th day of March, 1909, deceased was on some land something like a mile from where he lived, where his son Bill and other members of the family were engaged in cleaning off the brush and timber on same preparing it for cultivation. The deceased with his wife had gone to this land in the morning and had gotten a load of timber and brush cut therefrom, and carried it to his house and returned to the spot where his family were at work a short time before noon. Appellant had also been there early in the morning, but left before the deceased returned in the wagon with his wife, and went to deceased's house where he had dinner. He, appellant, returned in the afternoon. At this time he had a gun and had, it seems in the meantime, killed a couple of squirrels. The testimony of what took place is very conflicting. The evidence of the State shows that Bill Barron and Mrs. Barron, after the shooting, both fainted, the son claiming that he had no recollection of what occurred after the killing until the next morning. The wife also, according to some of the testimony, was more or less unconscious for quite awhile. According to the testimony of Bill Barron, as he and appellant were leaving the place where the son had been at work, deceased came toward them with a pitchfork in his right hand and made some inquiry as to whether they were going to quit work, and asked him where he was going; that he told his father he was sick and that he then remarked to appellant: "Take that damned old gun and get back out of here in a hurry or I will put you out." That when he said this appellant dropped his squirrels and threw his gun on his father-in-law and took aim, and that when appellant did this his father-in-law raised his hands up and that at the time he was raising his hands up he had the pitchfork in his right hand and that appellant then shot his father-in-law; that when the gun fired his father-in-law fell backward, and that as he fell he threw the pitchfork over on his left side and the handle fell toward his feet when appellant stepped two or three steps and shot him again. Mrs. Barron testified that she was not present when the killing was done, but saw appellant a minute or two afterwards, and asked him why did he do that, and he told her to be quiet, it was all over, and

that her son asked him why he did it, when he replied, the threat he made. That her son asked appellant what threat he made, when appellant replied, "He threatened our lives." There was considerable testimony by the deceased's daughter to the effect in substance that appellant had tried to get them to shoot deceased, offering to aid in killing him, and that on one occasion he had gone to some considerable detail as to how they might kill him, and then appellant would have his wife shoot a hole through his sleeve and hat and that they would then put the gun in deceased's hand and claim it was self-defense. Appellant's testimony was to the effect in substance that his relations with deceased had always been friendly, and that there was no differences between them; he says that there were some threats reported to him as having been made by deceased, but in substance says he did not regard them as serious and paid no attention to them. In his own behalf appellant says that at the immediate moment of the homicide that as he and the son had started away from the place where deceased was at work and in opposite directions from him, deceased came up from behind them, and thereupon, his statement, which we take from appellant's brief, is as follows: "He said to Bill, 'Where in the hell are you going?' Bill says, 'I am going to the house; I am sick.' He says, 'Are you done for the evening?' and Bill said, 'Unless I feel better.' He then turned to me and says, 'Walter, Walter, where in the hell are you going?'—something he never did call me—he always called me 'Walt.' It excited me when he spoke. I said, I am going to the house with Bill. He had what I taken to be an axe in his right hand. He switched it to his left hand. He said, 'Take that damned gun and get away from here or I'll kill you, you son-of-a-bitch,' and made a pass or move for his gun, and me backing and telling him to stop, and when he made his pass for his gun I shot like that (indicating). I was then in about twelve or fifteen feet of him. . . . I knew that he was in the habit of carrying the pistol. . . . From the distance he was from me and the rapid gait he was coming and the expression in his face I could see blood in his eyes, I told him two or three times to stop; that I did not want any trouble with him. As I threw the gun off my shoulder, I was excited; I never put the gun to my shoulder; I threw it toward him and shot to keep him off of me; to keep him from taking my life." In this connection it should be stated that the evidence showed that deceased habitually carried a pistol. This was a fact well known to all the members of his family. It was further shown that his wife had made in his vest a special pocket in which he carried the pistol. An examination of his clothing, however, showed that the pistol, when found, was resting in the bottom of the pocket on its handle and was to some extent covered with books and papers. A great many contradictory statements were proved as having been made by Bill Barron, and, if true, would strongly tend to show a killing in self-defense. Some statements are also claimed to have been made by Mrs. Barron to the same effect. In fact, a very

large part of the record is made up of impeaching statements of one kind and another and efforts of the State to meet this impeaching testimony. These matters of detail we deem it unnecessary to set out. What we have said will perhaps sufficiently disclose the nature of the case to make this opinion understood.

1. Among the matters urged in the motion for new trial is what is claimed to be error in the charge of the court on murder in the second degree. The court correctly defined murder in the second degree and all the constituent elements thereof, and these matters are not in any respect complained of by the appellant. After so defining murder in the second degree the court gave the following instruction: "If you believe from the evidence beyond a reasonable doubt that the defendant, Walter Pratt, in the county of Stephens, and State of Texas, on or about the 16th day of March, A. D. 1909, as alleged, with a gun, and that the same was a deadly weapon, did shoot and thereby kill M. C. Barron, as charged in the indictment, and that such shooting, if any, was not done under the immediate influence of sudden passion, produced by an adequate cause (as the same is hereinafter explained to you) and was not in defense of himself, against an unlawful attack, or what to the defendant might have reasonably appeared an unlawful attack producing in his mind a reasonable expectation or fear of death or some serious bodily injury, then you will find the defendant guilty of murder in the second degree, and assess his punishment at confinement in the State penitentiary for any term of years not less than five, as the jury may determine and state in their verdict." This was complained of in the motion for new trial, and it is strongly urged here that for this charge the case should be reversed. The complaint is that the charge nowhere instructs the jury that the killing must be unlawful or that such killing was done upon malice. In support of this contention we are referred to the case of Abbata v. State, 51 Texas Crim. Rep., 510. The charge there criticised is as follows: "If you believe from the evidence beyond a reasonable doubt that the defendants, in the county of Parmer, and State of Texas, on or about the 30th day of January, 1907, as alleged, with a deadly weapon, did shoot and thereby kill Viontonio Spinose, as charged in the indictment, you will find them guilty of murder in the second degree, and assess their punishment at confinement in the State penitentiary for any period that the jury may determine and state in their verdict, provided it be not less than five years." This charge was held to be erroneous and to constitute reversible error. In passing on this instruction Judge Henderson, speaking for the court, used this language: "The court should have distinctly told the jury that they must believe that the killing was unlawful, and done upon implied malice, as before defined, before they could convict them of murder in the second degree." It will be noted in the opinion that this statement is also made: "It is claimed that this charge would equally embrace a killing in self-defense." It is also obvious that the charge in the

Abbata case is erroneous in that by its terms it leaves the jury no option with reference to a conviction for manslaughter and there can be no doubt that the charge there considered was erroneous. To the same effect is the case of Clark v. State, 51 Texas Crim. Rep., 519, where practically this identical charge was given. The same charge has been more recently condemned in the case of Smith v. State, 57 Texas Crim. Rep., 585, 124 S. W., 679, where the court gave the following instruction: "If you believe from the evidence beyond a reasonable doubt that the defendant in the county of Dallas, and State of Texas, on the 26th day of May, 1908, as alleged, with a deadly weapon, to wit: a gun, did shoot and thereby kill Will Overstreet, as charged in the indictment, you will find him guilty of murder in the second degree, and assess his punishment at confinement in the State penitentiary for any period that the jury may determine and state in their verdict, provided it be not less than five years." We think, however, that while not happily expressed that the charge complained of in this case is not subject to the substantial objection that it deprives appellant of any right or that any imperfection in it could, in the nature of things, have injured him. The charge here given is quite similar to that given in the case of Puryear v. State, 56 Texas Crim. Rep., 231, 118 S. W., 1042. The charge there considered is as follows: "If you believe from the evidence, beyond a reasonable doubt, that the defendant, with a deadly weapon or instrument reasonably calculated and likely to produce death by the mode and manner of its use, in a sudden transport of passion, aroused without adequate cause, and not in defense of himself against an unlawful attack, real or apparent, reasonably producing a rational fear or expectation of death or serious bodily injury, with the intent to kill, did shoot and thereby kill Minos Long, as charged in the indictment, you will find him guilty of murder in the second degree and assess his punishment at confinement in the State penitentiary for any period that you may determine and state in your verdict, provided it be for not less than five years." In that case, as in this, the court had properly submitted the issue of self-defense. In passing on the sufficiency of this instruction we there said: "There is no complaint in the motion that murder in the second degree was not properly defined. The jury were in terms told that in order to constitute murder in the second degree, malice must exist, and further, that implied malice was inferred, or such as the law imputes to the act and fact of an unlawful killing. Then follows the language complained of. It is certain, if one kills another intentionally, under circumstances not amounting to murder in the first degree, or such as would reduce the grade of offense to manslaughter, and same is not in self-defense, it is unlawful. It is equally certain that under such circumstances the law would impute malice to appellant, and that the killing would be murder in the second degree. It is always unlawful for one person to intentionally kill another, unless the act is in self-defense or under such circumstances,

as in case of legal execution, that the act would be justified in law; and in a case like the one at bar, where murder in the second degree is well and fully defined, so well, indeed, that the definition escapes criticism or complaint, it is not believed that the mere omission in a particular paragraph to require the killing to be unlawful, or upon malice, would vitiate what would be otherwise a proper charge, where the facts required to be found, both as a matter of law and as a matter of fact, would make the killing unlawful and stamp it inevitably as of the grade of murder in the second degree."

"It is as stated, the law, settled time out of mind, that implied malice will be presumed whenever there is an intentional killing without just cause or excuse. As was said by Judge Clark in the case of Harris v. State, 8 Texas App., 90: 'A perfectly exact and satisfactory definition of that term, signifying its legal acceptation in a form at once clear and concise, has been often attempted, but with no very satisfactory permanent result. The differing minds of different courts have employed different terms and language in an attempt to convey substantially the same meaning; and, while a general similarity is apparent in all the definitions, the legal mind has not yet crystalized the substance of the term into a terse sentence readily comprehensible by the average juror.' Again, in the same case, the same learned judge uses this language: 'If malice, in all cases, must be an inference of fact to be deduced by the jury, and not in any case an implication of law to be expounded by the court, the inquiry at once arises: From what fact must this inference be deduced? Every inference legitimately arising must have a substratum of fact as a basis, and in the absence of such basis the law permits no inference. Clearly, then, the jury must infer malice from the isolated fact of killing, because we are discussing by way of illustration a case in which nothing else is proven.' Again, in the case of Gallaher v. State, 28 Texas App., 247, 12 S. W., 1093, the court use this language: 'Malice in its legal sense denotes a wrongful act, done intentionally, without just cause or excuse.'

"We think the charge, while not as clearly expressed as might be desired, is subject only to the construction that would imply and require a finding that the killing was unlawful, and a state of case in which the law of necessity would imply malice, and that the use of the words in said charge, 'with intent to kill,' relates back and covers any defect in the previous portion of the charge, and that the conclusion logically and necessarily follows that such killing was both intentional and unlawful. See Brittain v. State, 36 Texas Cr. Rep., 406, 37 S. W., 758; Neyland v. State, 13 Texas App., 536." The doctrine there laid down is particularly applicable to the case here, which is a charge practically identical with that held sufficient in the Puryear case, supra.

2. Complaint is made of the charge of the court on self-defense. On this issue the court thus instructed the jury: "Every person is

permitted by law to defend himself against any unlawful attack, or against what to the defendant might reasonably appear an unlawful attack, reasonably threatening injury to his person, and is justified in using all necessary and reasonable force to defend himself, but not more than the circumstances reasonably indicate to be necessary. Homicide is justified by law when committed in defense of one's person against any unlawful and violent attack, or what to the defendant might reasonably appear an unlawful and violent attack, made in such a manner as to produce a reasonable expectation or fear of death or some serious bodily injury.

"A reasonable apprehension of death or serious bodily harm will excuse a party in using all necessary force to protect his life or person, and it is not necessary that there should be any actual danger, provided he acted upon a reasonable apprehension of danger as it appeared to him from his standpoint at the time, and in such case the party acting under such real or apparent danger is, in no event, bound to retreat, in order to avoid the necessity of killing his assailant.

"If, from the evidence, you believe that the defendant killed the said M. O. Barron, but you further believe that at the time of so doing the deceased, in addressing the defendant, put his hand to his breast in an apparent attempt to draw a pistol, or if it then so reasonably appeared to the defendant, from his standpoint at the time, which from the manner and character of such action and the defendant's knowledge of the character and disposition of the deceased, caused the defendant to have a reasonable fear of death or serious bodily injury, at the hands of the deceased, and that acting under such reasonable expectation or fear the defendant killed the deceased, then you should acquit the defendant.

"And you are further charged that should you believe from the evidence that prior to the difficulty between the deceased and the defendant, the deceased made a threat or threats to take the life of the defendant, or to do him some serious bodily harm, and if, with knowledge of such threats, it reasonably appeared to the defendant at the time he shot the deceased, if he did so, that the said deceased was about to take his life, or to inflict on him some serious bodily harm, or to carry out and put into execution such threats so previously made against him, judged of from the standpoint of the defendant; or if you believe from the evidence that at the time the defendant shot the deceased, if he did so, that the deceased was then making any hostile demonstration toward defendant, or if it so reasonably appeared to the defendant, from which it then reasonably appeared to the defendant, judged of from his standpoint at the time, that the deceased was then about to take his life or to inflict on him serious bodily injury, then, and in any of such events, the defendant had the right to use all necessary force to repel such threatened or apparent danger, and to protect his life or person from such apparent injury, even to the extent of killing his assailant, and should you so believe, you would acquit

the defendant and say by your verdict not guilty." The objections to this charge are that same limits the right of appellant to defend himself to certain acts of deceased, and that it does not affirmatively tell the jury that they must view the danger from the standpoint of appellant; nor does it tell the jury that he was not bound to retreat in order to avoid the necessity of killing deceased. We think the second paragraph of the instructions copied above answers the last two objections above stated. It is there in terms stated that appellant would be justified if he acted upon a reasonable apprehension of danger as it appeared to him from his standpoint at the time, and further, that in no event was he bound to retreat in order to avoid the necessity of killing his assailant. It will be further noticed that self-defense was submitted both with reference to the threats claimed to have been made and also without reference thereto. We think it can scarcely be claimed that the court in instructing the jury that if they believed appellant killed Barron, but should further find that at the time of doing so he had in addressing appellant put his hand to his breast in an apparent attempt to draw a weapon, or if it reasonably so appeared to him at the time, from his standpoint, considering the manner and character of such action, and his knowledge of the character and disposition of the deceased caused him to have a reasonable apprehension of danger and that acting under such reasonable expectation and fear he killed deceased, he would be entitled to an acquittal. This charge, we think, sufficiently directed the attention of the jury to the facts in the case and that it was not essential or required that the court in submitting this substantial issue should have undertaken to have embodied in his charge the details of every fact relied on by appellant to sustain his claim and plea of self-defense.

3. Complaint is made of the charge of the court on the subject of manslaughter. We think that manslaughter was not in the case at all, but if it could be said that it was raised in the evidence, we think the charge is sufficient. On this question the court instructed the jury as follows: "Manslaughter is voluntary homicide committed under the immediate influence of sudden passion arising from an adequate cause, but neither justified nor excused by law.

"By the expression 'under the immediate influence of sudden passion' is meant: That the provocation must arise at the time of the commission of the offense and that the passion is not the result of a former provocation. It is not enough that the mind is merely agitated by the passion arising from some other provocation, or a provocation given by some other person than the party killed. The passion intended is either of the emotions of the mind known as anger, rage, sudden resentment or terror, rendering it incapable of cool reflection.

"By the expression 'adequate cause' is meant such as would commonly produce a degree of anger, rage, sudden resentment or terror in a person of ordinary temper, sufficient to render the mind incapable of cool reflection. Insulting words or gestures, or an ordinary assault

and battery so slight as to show no intention to inflict pain or injury, are not deemed adequate cause. Any condition or circumstance which is capable of creating and does create sudden passion such as anger, rage, sudden resentment or terror, rendering the mind incapable of cool reflection, whether accompanied by bodily pain or not, is deemed adequate cause. And where there are several causes to arouse passion, although no one of them alone might constitute adequate cause, it is for you to determine whether or not all such causes combined, might be sufficient to do so.

"In order to reduce a voluntary homicide to the grade of manslaughter it is necessary not only that adequate cause existed to produce the state of mind referred to herein, but also that such state of mind did actually exist at the time of the commission of the offense.

"Now, if you believe from the evidence beyond a reasonable doubt that the defendant, Walter Pratt, with a gun, and that the same was a deadly weapon, in a sudden passion arising from an adequate cause, as the same has been hereinbefore explained, and not in defense of himself against an unlawful attack, producing in defendant's mind a reasonable expectation or fear of death or serious bodily injury, with intent to kill, did, in the county of Stephens, and State of Texas, on or about the 16th day of March, A. D. 1909, shoot and thereby kill the said M. C. Barron, as charged in the indictment, you will find the defendant guilty of manslaughter and assess his punishment at confinement in the State penitentiary for not less than two nor more than five years as you may determine and so state in your verdict."

4. It is further urged that the cause should be reversed for the failure of the court to give in charge to the jury article 676 of our Penal Code to the effect that "When the homicide takes place to prevent murder, maiming, disfiguring or castration, if the weapons or means used by the party attempting or committing such murder, maiming, disfiguring or castration are such as would have been calculated to produce that result, it is to be presumed that the person so using them designed to inflict the injury." A sufficient answer to this contention is that the matter was not in any way raised by appellant either by bill of exceptions or by motion for new trial in the court below.

5. Finally, it is urged that the verdict of the jury is contrary to the law and unsupported by the evidence. To this we can not concede. There is ample evidence in the record which it is believed would have justified murder in the first degree. There are, as above stated, many contradictions in the record. If we should judge by the written pages before us we might well doubt whether the judgment attains the ends of justice, and yet if we could have been on the ground and have seen the witnesses, we might have taken the view of the case that the jury took, or might have acted as the learned trial court did in overruling the motion for new trial. It is the settled law that where there is evidence in the record to sustain a verdict that we will not, merely because of impeaching testimony, set aside and overrule the action of

the trial court in affirming the verdict of the jury assessing defendant's guilt.

As presented to us there is no error in the record, and it is, therefore, ordered that the judgment of conviction be and the same is hereby in all things affirmed.

*Affirmed.*

McCord, Judge, not sitting.

[Rehearing denied May 4, 1910.—Reporter.]