BILL ALEXANDER v. THE STATE.

No. 1067.    Decided April 12, 1911.

Rehearing Denied June 23, 1911.

1.—Murder—Charge of Court—Harmless Error—Article 723, Code Criminal Procedure.

Where, upon trial of murder, there were no bills of exception to the evidence and no requested charges and the evidence showed either murder in the first degree or self-defense, and upon all of which the court submitted proper charges which were attacked in a general way in a motion for new trial, there was no reversible error under article 723, Code Criminal Procedure, even if there was some immaterial error.

2.—Same—Murder in the First Degree—Case Stated.

Where, upon trial of murder, the defendant testified that he saw deceased and another coming up the road armed; that bad feeling existed between the parties; that he stepped to the side of the road fifteen or twenty feet behind a tree, set his Winchester down by the tree and with his shotgun in his hand, threw the safety off, ready to shoot; and the evidence further showed that he had been standing there for some time, etc., when he shot and killed deceased and his companion as they passed by, claiming self-defense, and there was no evidence to reduce the killing below murder in the first degree, and the court submitted both degrees of murder, manslaughter and self-defense, the conviction for murder in the first degree was sustained.

3.—Same—Charge of Court—Manslaughter.

Where, upon trial of murder, the evidence showed a case of murder in the first degree or self-defense, and did not raise the issue of manslaughter, yet the court charged on manslaughter, there was no reversible error.

4.—Same—Charge of Court—Manslaughter—Joint Attack.

Where, upon trial of murder, the evidence showed that two persons were killed in the homicide by the defendant, and the defendant was indicted for the killing of one of them, and that this one was the only one of the two who made any demonstrations, if any at all, as if to shoot defendant, and there was no hostile word or act shown on the part of the other deceased, and the court in his charge on manslaughter charged upon this phase of the evidence, there was no error in the court's failure to charge on a joint attack upon defendant; besides the issue of manslaughter was not raised. Davidson, Presiding Judge, dissenting.

5.—Same—Charge of Court—Self-Defense—Joint Attack—Threats.

Where, upon trial of murder, the evidence showed the killing of two persons by the defendant, he being indicted for the killing of one of them, and the court submitted the issue of self-defense as to said one, but also charged the jury that if it reasonably appeared to defendant at the time of the killing that the said two persons were acting together viewed from the standpoint of the defendant, to acquit him, and also submitted the issue of communicated threats by the deceased, there was no error in the court's failure

to further charge on a joint attack or threats. Davidson, Presiding Judge, dissenting.

**6.—Same—Charge of Court—Charge as a Whole.**

Where, upon trial of murder, the court submitted murder in the first and second degrees defining express and implied malice, and also manslaughter and self-defense, and applied the reasonable doubt between the different degrees of murder as well as between murder in the second degree and manslaughter, and to the presumption of innocence, when considered in its entirety, there was no error.

**7.—Same—Charge of Court—Self-Defense—Relation of Parties.**

Where, upon trial of murder, the court in connection with his charge on self-defense instructed the jury to consider the relation of the parties, their relative size and strength, their previous conduct, and declarations or threats, if any, of the deceased, and all other circumstances, there was no error. Davidson, Presiding Judge, dissenting.

**8.—Same—Charge of Court—Article 676, Penal Code—Deadly Weapon—Presumption.**

Where, upon trial of murder, the court instructed the jury that if it appeared to the defendant from any cause that his life was in danger, etc., he had the right to shoot the deceased, and that a deadly weapon is one which in the manner used is likely to produce death or serious bodily injury, and that if the deceased was in the act of making an unlawful attack upon defendant with a gun, etc., he should be acquitted, article 676, Penal Code, was substantially submitted and there was no error. Davidson, Presiding Judge, dissenting.

**9.—Same—Charge of Court—Omission in Charge—Practice.**

Where, upon trial of murder, the court substantially submitted article 676, Penal Code, and the defendant asked no special instructions and did not reserve any exception thereto but complained of certain omissions in the charge for the first time in his motion for new trial, there was no error. Following Martin v. State, 25 Texas Crim. App., 557, and other cases. Davidson, Presiding Judge, dissenting.

Appeal from the District Court of Harrison. Tried below before the Hon. W. C. Buford.

Appeal from a conviction of murder in the first degree; penalty, imprisonment in the penitentiary for life.

The opinion states the case.

*Lane & Lane* and *Y. B. Harrison* and *M. B. Parchman,* for appellant.—On question of court's charge on manslaughter and self-defense: Byrd v. State, 47 S. W. Rep., 721; Seeley v. State, 43 Texas Crim. Rep., 66; Swain v. State, 48 Texas Crim. Rep., 98, 86 S. W. Rep., 335; Orman v. State, 24 Texas Crim. App., 495, 6 S. W. Rep., 544.

On question of relative size of parties: Hickey v. State, 45 Texas Crim. Rep., 297, 76 S. W. Rep., 920; Vann v. State, 45 Texas Crim. Rep., 434, 77 S. W. Rep., 813; Benson v. State, 51 Texas Crim. Rep., 367, 103 S. W. Rep., 911.

On the court's failure to submit article 676 of the Penal Code: Kendall v. State, 8 Texas Crim. App., 569; Jones v. State, 17 Texas Crim. App., 602; Ward v. State, 30 Texas Crim. App., 687.

On the question of joint attack: Seeley v. State, 43 Texas Crim. Rep., 66; Willson's Crim. Statute, article 713.

*C. E. Lane,* Assistant Attorney-General, for the State.

HARPER, JUDGE.—The appellant in this case was indicted by the grand jury of Harrison County, charged with the offense of murder. Upon a trial he was convicted of the offense of murder in the first degree, and his punishment assessed at imprisonment for life.

In the incipiency of a discussion of this case we want to say that we regret very much to disagree with our presiding judge in his opinion in this case, but as we read this record, it presents the most aggravated case of murder that has come under our observation during the time we have been on the bench. The evidence, from the standpoint of the State, shows that in the latter part of June defendant went to the home of Jim Olive, and hollered to him to "hide out;" that he, defendant, had been before the grand jury about Olive having a pistol, when Olive replied that defendant would not have had to do so, if he had not "harped it all over the country." Defendant called him a liar, and reached for a gun he had with him. Olive struck him over the head with a hoe and knocked defendant to his knees as he reached for his gun. While on his knees he again made an effort to get his gun, when Olive again struck him with the hoe handle, and took the gun again away from him, pointing it at him, when defendant begged. Olive then took all the shells out of the gun and gave it back to defendant and told him to go home. Defendant then asked for some water, and Olive sent for the water, and washed all the blood off of defendant, and again told him to go on home. At this time deceased, F. T. Wagnon, drove up, and defendant and deceased spoke, and defendant asked deceased to take him home in the buggy. Deceased replied his horse was tired. Defendant then shook hands with Olive and asked him and his wife to pardon him for his conduct, but declined to shake hands with Wagnon. He started on home, and after getting about one hundred yards from the house he called Olive. Getting no answer, he cursed him. He then called Wagnon, cursed him, and told Wagnon "he (defendant) had been on his trail for a month, and would stay on it until he got there." Defendant in his testimony says he was drunk and does not know what took place that evening, except that he got several severe blows. As defendant walked off cursing, it was suggested that he would come back and give trouble. Olive sent for a neighbor to come and stay with him, and A. M. Chadwick did come to Olive's house, and Mrs. Olive, her son, and Chadwick all testify that that night, while the family was sitting on the porch, defendant did come back and hollered, and fired his gun, some saying the shots struck the house. Chadwick testified that he heard defendant cursing, and heard him say he was on deceased's damn warm trail, and would not sleep much until he got him; that deceased was a d—n s—n of a b—h. They went in the house and Olive got his gun and went out and his dog bayed the man doing the shooting in a clump of bushes,

when the man shot the dog and killed it. Several shots were exchanged that night, but no one injured. Defendant filed a complaint against Olive and Olive filed complaints against defendant. The feeling was very bitter, and threats pro and con are testified to by witnesses. Olive and Wagnon were brothers-in-law, and were witnesses in the cases against defendant, while defendant was a witness against Olive. They all carried guns with them wherever they went away from home. On the day of the killing they were all under bond to attend court at Marshall. Defendant says he saw Olive and Wagnon pass his house on the way to Marshall that morning, and he did not go because he was afraid they would have trouble. That he went over to Castleberry and Rodden's mill that morning and talked to Mr. Bass and stayed around there some time. That he did not 'phone the sheriff at this time, because he had not fully decided not to go to Marshall; that about 4:30 that evening he started again to go back to the mill, carrying with him a Winchester and a shotgun for protection, to telephone the sheriff why he had not come to court; that on his way to the mill, when about one-fourth or one-half mile from home, he saw deceased and Olive come driving towards home, and they had their guns, and he stepped out of the road to a tree about fifteen or twenty feet from the road, set his Winchester against the tree, slipped the safety on his shotgun and waited for them to pass, not intending to shoot them if they made no attempt to harm him, but to be in position to defend himself; that before they got quite even with him they turned their heads towards him and Wagnon started to raise his gun, when he shot five times in rapid succession; Wagnon fell soon after he began to shoot; as Olive did not fall at the first five shots, he loaded his gun and fired again, when Olive fell back in the wagon; he thought they were going to kill him, and he shot to protect himself. On cross-examination he said he could not see what Olive was doing, as Wagnon was between him and Olive. A. M. Chadwick, a witness for the State, testified that he went to town along with Wagnon and Olive that day; that they started home first, but he overtook them. They were riding in a wagon, sitting on a spring seat, sitting side by side; that a rain came up and they all stopped in a house. After the rain ceased they all started on, talking. Nothing was said about defendant; that just before they got to Cypress bottom they reached down in the wagon and got their guns, Wagnon taking his in his hands and Olive putting his down in front of him. Olive and Wagnon had to pass defendant's home in going to their home; that he, Chadwick, dropped behind them; that they had traveled about 350 or 375 yards when he heard the shooting; that he had seen them do nothing, and that he had not seen defendant until after the shooting was over. That he rode by and saw defendant standing about by a tree with a gun in his hands; that he could only see from his waist up, as there was a brush pile between defendant and the road that he

and Olive and Wagnon were traveling. Defendant said he did not know why he tried to hide when he saw Chadwick; that he did not know Chadwick was there until the shooting was over. Defendant then went on to the mill, he says, to telephone the sheriff. A witness says when he got there he said he had "two bucks out in the road." This defendant denied, but says he said that he thought the "little trouble was over." Dr. Allen testified he examined the bodies of both Wagnon and Olive. That Wagnon was lying on his back, with his feet over the seat, with his gun grasped in his hand; that Olive's body was in the wagon, with one foot over the seat and his gun was under the seat. Wagnon had eleven shot in his head, sixteen shot in his shoulder and neck and one through his nose. The shots entered from the left side. Olive was shot much in the same way; there were seven shot in the left side of the head, one in the back of the head and the balance just over the ear. The shot entered from the left side. There were shot in Olive's left shoulder, and from his waist up. The wounds in the head of both of them were instantly fatal. The wounds in the body were fatal, but not immediately fatal.

Deputy Sheriff Luke Cole testified he went to the scene of the killing and says: "That oak tree was, I suppose, twenty-four inches in diameter; they were, I suppose, twelve or fifteen feet from the road. There was a tree top there, pine top, and I should say it was something like thirty-five, maybe forty, feet long—that tree top was lying very near parallel with the road, and it lay right against the oak tree. Part of the top struck the oak tree and fell back and the other part lay within two or three feet of the oak tree. The main body of the top extended towards Marshall and was four and one-half or five feet off the ground. I did make an examination around the root of that tree. Well, I found where there had been parties walking around and standing around there and I found seven shells there. I did see some ambeer and some whittlings at the root of the tree over behind the tree, where there had been three little twigs bent, and then back in the center of the top, maybe twelve or fifteen feet, was another beat-out place, and there I found some cigarette stubs and burnt matches. These bent twigs were under the main body of the tree and made a blind, and these cigarette stubs and matches were right behind them limbs. As I first went out from behind the top I found one red shell about three feet from the butt of the tree top and about the center I found three red shells that had short brass bases and in the top about three feet from the standing tree I found three shells with a large brass base. There was nothing peculiar about those shells any more than they had the appearance of being reloaded and sewed across the ends with threads. These are the shells that I found. I found those three up next to the oak tree, which are the ones I called with large brass base, and those three I found in the center of the top, and this one here that had been marked or crumpled, I found at the foot of the log towards the bridge. Right against the tree, which is presented

on the map by the letter 'A,' I found evidences of the ambeer and whittling, and in the center of the pine top represented by letter 'B' I found the shell at the butt of the log, and then I came on up here and found three there about the center of the pine tops, and then I came on up to the oak three and found three there—the shells and two or three cigarette stubs and burnt matches, I found in the center of the tree top." He further testified: "I do not know that a man standing by that tree could be seen from the road by a man in the road. The limbs of that fallen pine and some bushes would prevent him from being seen from the road east of there. I do not think he could have been seen."

It was shown that Wagnon and Olive did not fire a shot. There was one cartridge in the barrel of Wagnon's gun, but none in the barrel of Olive's gun. Both guns had shells in the magazine.

Cole's testimony was in substance corroborated by Ellis Johnson, who was there when the investigation was made.

Defendant's witnesses deny that the ground was tramped around, and claim that a man could be seen from the road; they also denied seeing the shavings there, and the matches and cigarette stubbs. Defendant says he had just walked out there; that he cut no shavings and did not smoke there, saying: "I just stood there with my gun, but it was not cocked. To use an automatic gun, you can just throw the safety off at the time you get ready to shoot, and I was standing there with the safety off, so if I needed to shoot I was ready." (Page 99, statement of facts.) This was just before the shooting commenced.

There are no bills of exception in the record. No errors claimed in admitting or rejecting testimony. No special charges were asked, but the charge of the court is assailed in the motion for new trial, and every paragraph thereof is criticized. In this state of the record, under article 723 of the Code of Criminal Procedure, admitting there was some immaterial error, it would not be cause for reversal. In the case of Godwin v. State, 39 Texas Crim. Rep., 404, this court, speaking through Judge Henderson, says:

"Appellant contends that the court committed an error in giving a charge on provoking the difficulty by deceased. We are inclined to agree with appellant that such a charge was not called for by the evidence in this case, and we are further of the opinion that the charge as given was radically wrong. But the question here is, was the error of a material character, for under the Act of the Twenty-Fifth Legislature a charge is not only required to be erroneous, but must be calculated to injure the rights of the defendant. From the record there is no question that appellant, when the altercation occurred over the game of cards, invited deceased to engage with him in mortal combat—invited him from the game of cards, where they were disputing, to one side, stating that he wanted to talk with him. The deceased told him he would go if he would give him a

fair break. He told him he would, and defendant then had both pistols, his own and that of the deceased. After they had started, deceased asked for his pistol, and defendant gave it to him. After they had retired about thirty or forty feet from the blanket where they were playing cards, they confronted each other, engaged in a wordy altercation, each having his pistol in his hand. The witnesses say that deceased made the first demonstration; that is, he raised his pistol from his hip and cocked it. Defendant's witness, however, stated that all the time while deceased was cocking his pistol defendant had his pistol in his hand, presented and pointed at deceased's stomach. So that the iteration by the witnesses that deceased made the first demonstration is mere twaddle, and a play upon words. When deceased made that demonstration, appellant had already invited him to mortal combat, and he then had his pistol drawn and presented at a vital point of his body. There is strong evidence to show that during all this time appellant knew that deceased's pistol was not loaded. But concede that he did not know this fact, still there is no pretense of self-defense in this case. If the court had charged on mutual combat it would have been entirely correct. But does it follow, therefore, that a charge on provoking the difficulty was. calculated to impair the rights of appellant? We think not. An invitation to engage in mortal combat and provoking a difficulty may not be one and the same thing, but in neither does the right of self-defense exist; and there would have been no error had the court refused to charge on self-defense altogether." Again, in Wright v. The State, 40 Texas Crim. Rep., 45, speaking through Presiding Judge Davidson, this court says:

"In this case, however, we do not believe the error was of such a character as to prejudice the rights of the defendants, from the fact that the evidence shows that if the parties were guilty at all they were all guilty as principals, being actually present and participating in the original taking. The State's testimony shows that the four mentioned parties were bodily actually present and participated in the taking of the hog, and carried it from the place of the killing home, some two and one-half or three miles. Under the recent Act of the Legislature, the error in the charge must be calculated to injure the rights of the accused, before this court would be authorized to reverse the judgment. Acts 25th Leg., p. 17. And not only must the error be calculated to injure the rights of the defendant, but it must be excepted to at the time of the trial or on motion for new trial. This matter was brought forward in the motion for a new trial; but inasmuch as, under the peculiar facts of this case, it was not calculated to injure the rights of the defendants we would not be authorized to reverse the judgment under the Act of the Legislature above cited."

In this case if the defendant is guilty at all, he is guilty of murder in the first degree. In his own testimony he admits he saw deceased

coming up the road; that he stepped to the side of the road fifteen or twenty feet, set his Winchester down by the tree, and with his shotgun in his hands "just stood there with my gun. You can just throw the safety off at the time you get ready to shoot, and I was standing there with the safety off so if I needed to shoot I was ready;" and he did shoot, and the State's witness Cole would indicate that he had been standing there tramping around behind a "blind" for some time, chewing, smoking and waiting, with a Winchester rifle and an automatic shotgun loaded with buckshot, and nowhere in the record is there evidence, if the killing was unlawful, to reduce it below murder of the first degree. If the State v. Goodwin, supra, is to be adhered to, if defendant was standing there with the safety on his automatic gun slipped, ready to shoot, even if Wagnon or Olive had made a demonstration, he would not be acting in self-defense, for he was ready, willing and had placed himself in position for the combat to begin. (Gilleland v. State, 44 Texas, 356; Crist v. State, 21 Texas Crim. App., 361.) But we will not rest our opinion here, for under the facts of this case, if the court committed any error, it was error in behalf of defendant.

The court charged on manslaughter, and in his charge stated:

"Manslaughter is voluntary homicide committed under the immediate influence of sudden passion, arising from adequate cause, but neither justified nor excused by law.

"By the expression, under immediate influence of sudden passion, is meant: 1st. The provocation must arise at the time of the commission of the offense and that the passion is not the result of a former provocation.

"2d. The act must be directly caused by the passion arising out of the provocation; it is not enough that the mind is merely agitated by the passion arising from some other provocation, or a provocation given by some other person than the party killed.

"3d. The passion intended is either of the emotions of the mind, known as anger, rage, sudden resentment or terror, rendering it incapable of cool reflection.

"By the term adequate cause is meant such as would commonly produce a degree of anger, rage, sudden resentment or terror in a person of ordinary temper sufficient to render the mind incapable of cool reflection.

"Any condition or circumstance which is capable of creating and does create sudden passion, such as anger, rage, sudden resentment or terror, rendering the mind incapable of cool reflection, whether accompanied by bodily pain or not is adequate cause.

"Where there are several causes to arouse passion, although one of them might not constitute adequate cause, yet all the causes combined might be sufficient to do so.

"In this case as to whether the homicide was committed under the immediate influence of sudden passion and as to whether there was

adequate cause for such passion are questions of fact for the decision of this jury.

"In order to reduce a voluntary homicide to the grade of manslaughter it is necessary not only that adequate cause existed to produce the state of mind referred to, that is, of anger, rage, sudden resentment or terror sufficient to render it incapable of cool reflection, but also that such state of mind did actually exist at the time of the commission of the offense. Although the law provides that the provocation causing the sudden passion must arise at the time of the killing, it is the duty of the jury in determining the adequacy of the provocation, if any, to consider in connection therewith, all the facts and circumstances in evidence in the case, and if you find that by reason thereof the defendant's mind at the time of the killing was incapable of cool reflection, and that said facts and circumstances were sufficient to produce such state of mind in a person of ordinary temper, then the proof as to the sufficiency of the provocation satisfied the requirements of the law, and so in this case, you will consider all the facts and circumstances in evidence in determining the condition of defendant's mind at the time of the killing, and the adequacy of the case, if any, producing such condition.

"Now, if you believe from the evidence beyond a reasonable doubt, that at the time and place stated in the indictment, the defendant and the deceased unexpectedly and suddenly met, and that on account of the acts and conduct of deceased taking place at the time, if any, has been shown, defendant's mind was aroused to such a degree of passion known as anger, rage, sudden resentment or terror as to render defendant's mind incapable of cool reflection and that defendant's mind was thereby rendered incapable of cool reflection, and that the acts and conduct of deceased at said time, if any, was such as would commonly produce such a degree of anger, rage, sudden resentment or terror in a person of ordinary temper sufficient to render his mind incapable of cool reflection, and that defendant under these circumstances shot and killed deceased with a gun and that such gun was a deadly weapon not in self-defense as explained elsewhere in this charge, then find defendant guilty of manslaughter and assess his punishment at confinement in the penitentiary for any time you see proper, not less than two years nor more than five years.

"In passing on the condition of defendant's mind at the time of the killing you will consider the relation of the deceased and defendant to each other, their former difficulties, if any, and all the facts and circumstances in evidence, viewing the same from the standpoint of the defendant."

Complaint is made of that part of the charge wherein it says: "And that the acts and conduct of deceased at the time," etc., and it is claimed that the court should have charged "that the acts and conduct of deceased or Jim Olive or either or both of them," etc. Now, what were the acts and conduct of Jim Olive? Chadwick says

that about 350 yards from the scene of the killing as he drove into Cypress bottom, Olive picked up his gun and laid it down in front of him. It was under Olive and the seat after he was killed. Defendant in his cross-examination says he could not tell what Olive was doing. That Wagnon was between him and Olive; "they were sitting side by side on the spring seat, and Wagnon was the near man to me and was sitting just like I am, and I could not see how Olive had his head, because Wagnon was between me and him. . . . Olive could not have been facing me when I shot the first shot, because Bud Wagnon was between me and him, and if Mr. Olive turned in his seat I don't know it." No one says one single word was passed by anyone at the time of the shooting. Defendant admits he could not see Olive and there was no conduct or act on the part of Olive testified to at the time defendant began to shoot, and there was no evidence upon which the court could have based such a charge, and the only evidence that Wagnon did anything is where defendant says Wagnon turned his head and started to raise his gun. It is true that defendant in direct examination spoke of "them" and "they," doing so and so, but on cross-examination, separating them, Wagnon was the only man he claimed to see do any act, or so conduct himself that he thought it was necessary for him to shoot. This court has too often held that where there is no basis in the evidence it is not error for the court to fail to charge on an issue not presented by the evidence. In the case of Wolfforth v. State, 31 Texas Crim. Rep., 387, this court, speaking through Judge Davidson, says: "It is too well settled in this State to be questioned that when the law of the case has been given in charge it is sufficient. This applies as well to manslaughter as other grades of homicide. The causes which reduce a killing from murder to manslaughter must be operative in the mind of the slayer at the time of the homicide, in order to bring the killing within the purview of our statutes relating to that offense. The passion must also be shown, and the charge should be confined to the cause or causes which are shown to have created the passion. An instruction upon matters not shown by the evidence is not required and should not be given." In this case Jim Olive is not shown in the testimony, even from defendant's standpoint alone, to have done any act or said a word at the time he commenced to shoot, and there was no occasion for the court to have given such charge. In addition to this, under the facts of this case, we hold there was no necessity for the court to have submitted the issue of manslaughter, and the charge as given by the court, was more favorable to defendant than he had a right to expect. When we read the definition of manslaughter, as is correctly defined in the charge herein copied, there is nothing in the evidence to have produced that state of mind that would reduce an unlawful killing to manslaughter. No "adequate cause" is testified to. Defendant does not show terror or rage, but he testifies he stepped to the side of the road, set one gun

down, put the other one in condition to fire instantly and waited his time to shoot if he deemed it necessary, showing deliberation and coolness in his every act. He does not claim they said one word, but says Wagnon "turned· and raised his gun." If the jury believed this, under some circumstances it might present a case of acting in self-defense, but it has never been held in this State that such conduct would reduce an unlawful killing to manslaughter. In Eggleston v. The State, 59 Texas Crim. Rep., 542, 128 S. W. Rep., 1108, this court says:

"Complaint is made in the motion for new trial and before this court that in submitting the issue of manslaughter to the jury the court did not submit all the law with regard to manslaughter, and in the charge that was given the court omitted some of the elements of manslaughter, and for that reason, together with the failure of the court to give the requested instructions asked by appellant with regard to manslaughter, error prejudicial to the appellant was committed by the trial court. A most careful review of the· testimony in the case demonstrates to our minds that there is no manslaughter in this case. The theory of the State was that the defendant had become incensed at the appearance of the deceased upon the ground and his advice to the negroes to stop playing, and regarded same as an interference with his purposes on that night, and fearing that the deceased might have the parties arrested, he concluded to provoke a difficulty with the deceased, for the purpose of killing him, and the evidence on the part of the State shows a killing without any excuse whatever. While on the part of the defendant, if his story is to be believed, it is a clear case of self-defense. It seems to be the impression with some members of the bar that in all cases where self-defense arises that necessarily manslaughter is in the case, but this is not a correct interpretation of the law. It would be wrong for the court to submit an issue not raised by the testimony, and as manslaughter could not, from any possible view of the facts as detailed in the trial of this case, be suggested, we think manslaughter is not in the case. Therefore, if manslaughter is not in the case, any error of the trial court in its charge on this subject could not avail the appellant, as said charge in submitting this issue was favorable to the appellant, and would give the jury an opportunity to find the appellant guilty of a lower grade of homicide than murder in the second degree."

Defendant also complains of the charge on self-defense. The court instructed the jury: "Homicide is permitted by law and subject to no punishment when inflicted for the purpose of preventing the offense of murder, or for the purpose of preventing the infliction of serious bodily injury when the killing takes place under the following circumstances:

"1st. It must reasonably appear by the acts or the words coupled with the acts of the person killed that it was the purpose and inten-

tion of such person to commit the offense of murder or inflict such injury.

"2d.    And the killing must take place while the person killed was in the act of committing said offense or inflicting such injury or after some act or demonstration done by him showing evidently an intent to commit such offense or inflict such injury.

"3d.    And it is not essential that there should be any actual or real danger to the life or person of the party killing, if there be an appearance of danger caused by the acts or demonstrations of the party killed or by words coupled with the acts or demonstrations of such party which produce in the mind of the defendant, viewed from his standpoint alone a reasonable expectation or fear of death or some serious bodily injury to himself.

"However, the party whose person is unlawfully assailed is not bound to retreat to avoid the necessity of killing his assailants.

"Applying the foregoing instructions to the facts of this case upon the issue now submitted to you, you are charged that the defendant would be justified in killing the deceased if it is shown to have been done to prevent the deceased from murdering him or from inflicting serious bodily injury on him, or if it is shown that at the very time of the killing or immediately preceding the killing the deceased had made or was in the act of making some hostile demonstration toward the defendant such as would produce in his mind a reasonable fear or expectation of death or some serious bodily injury; but in that case to justify the killing it must reasonably appear from the acts of the deceased that he intended to murder, or inflict some serious bodily injury upon the defendant, and the killing must have taken place while the deceased was in the act of committing such offense or inflicting such injury or after some act done by him showing evidently an intention to commit such offense or injury.

"Therefore, if you shall believe from the evidence that the defendant at the time of the homicide believed his life was in danger or serious bodily injury would be inflicted upon him, such fear being produced by hostile acts on the part of the deceased, if any, and that at the time he fired the fatal shot it reasonably appeared to him, from all the circumstances of the case, viewed from the standpoint of the defendant alone, that the deceased was about to shoot him, and if you so believe you will acquit the defendant.

"Or if you believe from the evidence that at the time the defendant shot and killed the deceased, that the deceased was in the act of making an unlawful attack upon the defendant with a gun and it reasonably appeared to defendant from his standpoint by the acts of the deceased that it was the purpose and intent of the deceased to shoot him, and which unlawful act of the deceased produced in the mind of the defendant, viewed from his standpoint at the time, a reasonable expectation or fear of death or of some serious bodily

injury and that acting under such fear or expectation so produced he shot and killed the deceased, then such killing would be in self-defense, and if you so believe, you will acquit the defendant. Or if the jury shall believe from the evidence that the deceased was making an unlawful attack on the defendant, or was doing any act, or made any demonstration which produced in defendant's mind viewed from his standpoint at the time a reasonable expectation or fear of death arising from such acts or demonstrations of deceased, he was justified in so doing and in law it would make no difference whether the danger to defendant's life or person was real or imaginary, if it had the appearance to defendant of being real and which appearance must be viewed from the standpoint of defendant at the time alone and from no other standpoint.

"In every case in determining whether the defendant acted from a reasonable expectation or fear of death or serious bodily injury from the deceased, it is proper for the jury to take into consideration the relation of the parties, relative size and strength of the parties, and previous conduct, declarations or threats, if any, of the deceased, and all other circumstances, if any, in the case."

This charge is applicable to the evidence in this case. The only one who testifies on this point is defendant. He says not a word was spoken, but Wagnon commenced to turn his head towards him, at the same time raising the gun, and he (defendant) fired. This charge presented this theory. But in addition to this, as there were threats testified to in the case, the court further charged the jury:

"Where a defendant accused of murder seeks to justify himself on the ground of threats against his own life he may be permitted to introduce evidence of the threats made, but the same shall not be regarded as affording a justification for the offense unless it be shown that at the time of the homicide the person killed by some act then done manifested an intention to execute the threats so made.

"In passing upon the issue of threats the jury will consider and determine the same from the standpoint of the appearances to defendant and the effect upon his mind at the time of the killing and not in the light of subsequent events, if any, if the facts or circumstances suggested to defendant's mind that he was in danger of death or serious bodily injury and he so believed, then in law he would not be guilty of the homicide, but would be justifiable in the killing.

"So, if the jury shall believe from the evidence that previous to the time of the killing the deceased had made threats to take the life of defendant and that defendant knew of such threats, if any, and that at the time of such killing or just preceding the killing the deceased did any act, however slight, or spoke any words which the defendant from his standpoint believed either manifested or evidenced an intention on the part of the deceased to carry his threats into execution, and acting under such circumstances the

defendant shot and killed deceased, then the defendant would be justified in the act and you will acquit him."

The defendant says that the court should have presented the theory that "if deceased or Jim Olive," etc., instead of deceased alone. As hereinbefore stated, while discussing the charge on manslaughter, no one shows that Jim Olive was doing any act at the time the shooting began, defendant saying he did not see him do anything, and no one claimed to even see Olive at that time. But out of the abundance of precaution, after giving the above charges, the court charged the jury: "If the jury believe from the evidence that it reasonably appeared to the defendant at the time of the killing that the deceased, F. T., or Bud, Wagnon, and Jim Olive, were acting together, viewed from the standpoint of the defendant, and that Bud Wagnon, or Jim Olive, made a demonstration to shoot the defendant with a gun, then the jury are instructed that the defendant had a right to shoot and to continue to shoot until all danger as it reasonably appeared to defendant was passed, and in this connection you are charged that in no event was the defendant bound to retreat in order to avoid the necessity of·killing the deceased."

Isolated paragraphs of a charge should not be taken and criticised if the charge, taken as a whole, is not subject to the criticism.

The defendant complains of the following charge: "If from the evidence you believe beyond a reasonable doubt that the defendant is guilty of some degree of murder, but have a reasonable doubt as to whether the killing was committed upon express or implied malice, then you must give the defendant the benefit of the doubt, and in such case, if you find defendant guilty, it could not be of a higher grade of offense than murder in the second degree." Defendant's complaint is, "Because, if the jury from the evidence, had a reasonable doubt in their minds that the killing was not committed upon express or implied malice, then the defendant could not be guilty of murder and the grade of homicide, if any, was bound to be less than murder in the second degree." If this was all the charge, defendant might have ground for his complaint, but the court further told the jury in the next paragraph, "If from the evidence you believe beyond a reasonable doubt that defendant is guilty of some grade of culpable homicide, but have a reasonable doubt whether the offense, if any, is murder in the second degree or manslaughter, you must give him the benefit of the doubt, and if you find him guilty, it could not be of a higher grade of offense than manslaughter." And then added: "If from the evidence you have a reasonable doubt that defendant is guilty of manslaughter, find him not guilty."

These charges have been so often approved by this court, and it has been held to be the duty of the trial court to give in charge the law applicable to reasonable doubt as to the degrees of homicide, it seems useless to cite authorities, but see Powell v. State, 28 Texas Crim. App., 393, and authorities cited.

The court also give in charge the law of reasonable doubt and presumption of innocence as applicable to the whole case.

The errors complaining of the definition of malice and implied malice and the application thereof, are without merit as applicable to the evidence in this case. McGrath v. State, 35 Texas Crim. Rep., 413.

Appellant also complains that the court erred in charging the jury: "In every case in determining whether the defendant acted from a reasonable expectation or fear of death or serious bodily injury from the deceased, it is proper for the jury to take into consideration the relation of the parties, relative size and strength of the parties and previous conduct, declarations or threats, if any, of the deceased, and all other circumstances in the case." Defendant says there was no evidence as to the relative size of the parties. This charge was given in connection with the law of self-defense, and when taken in that connection with the other charges given, is favorable to defendant as a whole in instructing them that they must take into consideration all circumstances in the case in passing on whether the defendant had the right to shoot and kill.

There is also assigned as error the failure of the court to charge article 676 of the Penal Code. When we read the entire charge the substance of this article is manifest all the way through it, and the jury is told that if it appeared to defendant from any cause that his life was in danger he had a right to shoot. The court instructed the jury: "A deadly weapon is one which in the manner used is likely to produce death or serious bodily injury." . . . And "that if the deceased was in the act of making an unlawful attack upon defendant with a gun, etc., he should be acquitted." And throughout the entire charge the jury is informed that if deceased was using his gun in a way calculated to lead defendant to believe his life was in danger he was justified in killing deceased. Defendant asked no special instruction, did not reserve any exception to the charge of the court, but complains of this omission for the first time in his motion for a new trial. In Martin v. State, 25 Texas Crim. App., 557, Judge Willson, speaking for the court, says:

"In this case the bills of exception to the charge of the court were not reserved in the manner required. After the jury had retired from the box, counsel for defendant stated to the court that he desired to except to the charge of the court. Thereupon the court asked the counsel to state the grounds of exception; that the court was ready to supply any omission, or correct any error which might be in the charge, if pointed out. Counsel did not comply with this request of the court, and did not specify exceptions to the charge until after the return of the verdict. We are not, therefore, called upon to consider the exceptions to the charge, and decline to do so, there being no fundamental error pointed out, or perceived by us, in the charge."

This has always been the rule in this court so far as we can find,

unless it is shown that the omission was injurious to the defendant. In this case no injury could result to the defendant, viewed in the light of the entire charge. No exception was reserved to the charge or any part thereof. The first complaint was in motion for new trial, and after verdict has been rendered.

The evidence in this case, to our minds, presents but two theories, one is that the defendant is guilty of murder in the first degree, or was justified in his acts. If defendant hid behind the blind fifteen or twenty feet from the road, and lay in wait, watching for deceased, and shot him as he was driving by, it was murder in the first degree. This was the contention of the State, and there was evidence on which to base it, and the jury so found. There is no evidence making it a lesser degree of homicide. The defendant's theory was that Wagnon attempted to kill him, or from his conduct, taking into consideration what he had previously heard, he (defendant) believed his life was in danger, and, therefore, he was justified in killing. Judge Wheeler, in the case of O'Connell v. State, 18 Texas, 343, says:

"The error assigned in the charge of the court is, in substance, that it does not distinguish and define the degrees of murder. But it must be observed that the mere omission to give instructions is not error. The court is not bound in any case to give instructions not asked for by the party. If the charge of the court was not satisfactory, it was the right of the defendant or his counsel to ask such instructions as he thought proper. If he omitted to ask particular instructions, he can not assign as error the omission of the court to give them. It is no objection to the charge of the court, that it supposes the state of fact which the evidence showed really to exist, and deduced the legal conclusion applicable to such a state of fact. This is precisely what every charge should do. That is the design and purpose of giving instructions to the jury; it is to inform them respecting the law applicable to the particular case in hand; and the more exactly the charge is adapted to the very case, the more likely will the jury be to arrive at a correct conclusion in the application of the law to the fact. Instruction beyond what the facts call for can never subserve any beneficial purpose, and may mislead. The charge should be framed and is to be considered in reference to the facts of the case. And we are of opinion that there was nothing in the evidence in this case to call for an exposition of the law upon the degrees of murder. There really is no conflict in the testimony. The witnesses who testify to having seen the original assault, accord perfectly in their statements in every material particular; and those whose attention was attracted by the noise, and who witnessed only what transpired after the assault was begun, coincide in their statements, substantially in all that is material, with the other witnesses, as to what transpired afterwards. If the witnesses were entitled to credit—and of that the jury were to judge—it unquestionably was a premeditated and deliberate homicide, committed under circumstances

which did not admit of any extenuation, mitigation or excuse; and consequently, was murder in the first degree; under the evidence it could not be of a less degree; and there was, therefore, no occasion to instruct the jury respecting the degree of murder. The case of Shoter v. The People, determined by the Court of Appeals of New York, may be referred to as affording a very forcible practical illustration of this principle, if, indeed, it be not too obvious to need illustration. The prisoner was convicted of murder, and sought a reversal of the judgment for error in the charge of the court. But although there was error in the charge, yet as it was upon a doctrine of the law of homicide, on which the evidence in the case did not call for instructions, the Court of Appeals held it no ground for reversing the judgment."

This has always been the law from that day, the early judicial history of Texas, to today. We do not think under the facts there was any error in the charge of the court, but if error there be, it is a case in which the State's case shows lying in wait and a killing upon premeditated malice, and there is no error in the charge on murder in the first degree. If the defendant's statement is true, he stood there with his automatic gun with the safety slipped ready to shoot, striking the deceased in the side of the head and shoulder, remarking after he left "the little trouble is over," or, "I left two bucks down there in the road." However, the court presented the theory of self-defense in a very favorable light to defendant, and the jury found the theory of the State to be correct.

The judgment is affirmed.

*Affirmed.*

PRENDERGAST, JUDGE.—I concur in Judge Harper's opinion. The case should be affirmed.

DAVIDSON, PRESIDING JUDGE (dissenting).—Appellant was allotted a life sentence in the penitentiary for murder in the first degree. The indictment charged him with killing a party named F. T. Wagnon. The evidence shows that at the same time and place and in the same difficulty appellant shot and killed Olive. The evidence shows beyond any question that there had been previous troubles between the parties, and especially between appellant and Olive. That Olive had on one occasion, while appellant was in an intoxicated condition, beat him very badly with a hoe. There had been numerous threats made by Olive and Wagnon to take the life of appellant, all of which had been communicated. Appellant had been arrested at the instigation of these parties for carrying a pistol. He had charged Olive with assault with intent to murder. Wagnon and Olive were witnesses against appellant and he against them. These troubles had been going on for some length of time. We deem it unnecessary to go into a detailed statement in regard to these previous difficulties,

threats and matters of that sort. Suffice it to say that there was no question of the existence of the troubles and the animosities and threats.

On the day of the homicide the case against appellant for carrying a pistol was to be tried at the county seat. The two deceaseds, Olive and Wagnon, were witnesses against him and went to court. Appellant did not go, giving as a reason that he was afraid that the two deceased parties would kill him. In the evening of the same day Olive and Wagnon were in a wagon returning home from court, with Chadwick in company with them. As they approached what the witnesses termed Cypress bottom, the two deceaseds got their guns from under a wagon-sheet and laid them across their laps, Wagnon holding his in his hand. This was something like 150 yards before they reached the point where the tragedy occurred. Chadwick was riding a short distance in the rear of the parties in the wagon. After reaching a point of about 150 to 200 yards from where they took their guns from under the wagon-sheet, a shot was fired at them from one side of the road, followed by four or five others, the witnesses not being accurate, but stating there were from five to seven shots fired, both occupants of the wagon being killed. Appellant fired those shots.

I am not in full accord with the statement of the case found in the majority opinion so far as it relates to the questions suggested for revision. Prior to the homicide there had been serious trouble between the parties. Many threats had been made by both of the deceased parties against the life of the appellant. Twice he had been arrested at their instigation and prosecuted. Olive had beaten him on one occasion to insensibility when he was in a drunken condition, using a hoe for that purpose. The State's theory, under the circumstances, was that appellant was actuated by malice, hatred and revenge, and was lying in wait for the two deceased parties, Wagnon and Olive, for the purpose of killing them in pursuance to a formed design, and that he did in fact kill both of them as they were traveling along the public road. Appellant's theory was that he had intended to go to town on that particular day to stand his trial, but after thinking over the matter he was afraid to go on account of the presence of these two parties, Olive and Wagnon, and for fear that they would kill him. They were witnesses against him in the case pending against him in court. He, therefore, abandoned the idea and did not attend the trial. In the evening he says he had occasion to go to a mill some distance away for the purpose of telephoning the sheriff his reasons for not attending court. En route from his home to the mill he came to the road crossing Cypress creek. Traveling down that road he saw the two deceased parties traveling the same road in his direction. Fearing an attack from them he stepped to one side a short distance from the road and got near a tree, but plainly in sight of the road. He states that the

parties were approaching him in a wagon and had their guns across their laps, and in order to avoid having trouble with them he left the road, thinking if he got out of their way they would pass him by without trouble, but when they reached a certain point, something like thirty or forty yards from him, they began preparation or made movements as if they intended to shoot, whereupon he fired and continued firing until he shot several times. The horses ran, and when the wagon was found the two bodies were in it, Wagnon with his Winchester firmly gripped in his hand, and Olive lying in the bed of the wagon with his gun by him. Wagnon's grip upon the gun was sufficient to hold it until it was taken out of his hand after his death. The State's witness, Chadwick, who was riding a short distance in the rear of the wagon at the time of the difficulty, did not see appellant until after the shooting. He went hurriedly by and did not stop or have any conversation with appellant. The evidence showed the reputation of the two deceased parties was sufficient to show that they were men who would execute threats they had made. They were brothers-in-law, and their threats and conduct were so intimately blended as to show practically on their part a common enmity and a common cause against appellant, and common action at time of the shooting.

Appellant, among other things, testified as follows: "As I was coming into Castleberry & Rodden's mill somewhere, I reckon about fifty or seventy-five yards near as a man can guess, I saw these parties coming each with his gun in his hand, and I had one in each hand, and I was coming up that road and thought once I would go direct on and pass them, and I says I just can't naturally take the chances, and I just steps by the side of this oak tree and set the Winchester down against it and stood there with the gun in my hand, and they saw me when I quit the road and there was not anything to keep them from seeing me by the tree but just a few scattering trees, and I didn't aim to fire a gun or move if they had not raised their guns to shoot me. Both of them raised their guns as far as I could see, and especially Mr. Wagnon, as he was on the lefthand side. It was a Winchester gun that he had, and he went to raise it to shoot me and I commenced to fire. I don't personally know how many times I fired."

On cross-examination he says: "I got in the road just around the far end of the bridge, and I walked on down that road. Well, you can see a good piece down that rockway. I can't say how far down that rockway you can see, but you can see further now than you could in September. I don't know how far down the rockway you could see. . . . Well, now I really don't know how far I traveled that road before I saw them, but it could not have been 200 yards. I don't believe it was 200 yards this side of the bridge to where it was done. I did travel it something near 125 yards. I did not see Mr. Chadwick then. They did see me when I left the road, and we were

about seventy-five yards apart when we saw each other. I was back ten or fifteen steps towards the bridge when I saw them. They did keep on coming and I kept going. I never counted how many steps I had taken before I turned out. I turned out from the rockway right by that tree; when I got even with that tree I turned away from the rockway and they saw me do that, and they saw me go to that tree. I don't know whether they saw me set down my Winchester, but I don't expect they did. They did see the gun in my hand. . . . I just walked right up to the tree and walked like here was the tree and set the Winchester directly north of the tree, which is towards the bridge, and I didn't set it behind the tree. When I set the Winchester down I stood there by the side of that tree. I did not take the safety off of my gun, and they kept coming. Q. After you got to the tree and set your gun down, how far did they have to come before the shooting commenced? A. They would have to come fifty yards, something near that. When I set the gun down and got beside the tree they were fifty yards from me, and when I went out there they never moved their guns, they both just had them pitched in front of them—I mean by pitched, having them laying across their knees with the barrels in front of them. I stood there beside the tree and north of the tree towards the bridge. When Mr. Wagnon raised his gun as if to present it to shoot, the wagon was the least bit this way from the tree, and when they came up there I was in just as plain view as my hand is, and they came on up, yanked a little to the right—I mean by yanked that they were triangled to the right, and that they were a little towards Marshall. They had not got even with me when the shooting begun. I expect they lacked ten or twelve or fifteen or maybe twenty feet of being even with me when the shooting begun, and they were not even then with the big oak on the opposite side because that is mighty near direct; then Mr. Wagnon made a move with the gun as if to present it to shoot me and I fired, and they never fired a single time, but they done their best to fire. . . . Wagnon had fell at the time he got just opposite with me and Olive didn't fall—Olive went a little piece further before he fell. . . . I said before this tree was about fifteen feet from the rockway, and that is what I would say now, and a little more than twenty feet from the dirt road. The rockway is maybe twelve feet wide. . . . Wagnon was getting his gun direct up this way as to shoot me. He did not have the gun to his shoulder, never did get it to his shoulder; he was coming up with that gun just that way, and I won't say which side it was on, but he brought the gun in that position as to shoot and I fired. I won't say that at the time I fired he had the gun with the butt of the stock against his stomach. He did have it grasped in both hands, and then I fired and shot right at his head as well as I could tell. He looked to me like he was coming around to look at me. He was not sitting with his back to me; he was sitting with his side more

to me than anything else. They were sitting side by side on the spring seat, and Wagnon was the near man to me and was sitting just like I am and I couldn't see how Olive had his head because Wagnon was between me and him. I said I wouldn't say whether he did or did not have his face directly to me, and I won't say because I could not tell, because to the best of my judgment he was going to whirl and shoot me. . .· . I said he had his gun going up to one shoulder or the other and was coming just this way with it as he got up to me. It looked to me like he had his face and head towards me as he made this threatening demonstration, and I shot at his head. It is hard for me to tell where I shot him next. I really don't know how many shots I shot at Mr. Wagnon before I shot at Jim Olive. . ·. . I suppose Olive got some of these shots himself (referring to the shots fired at Wagnon). No doubt but what he got more than two loads. I can't say whether I did or did not shoot him three times. I didn't then turn and shoot Mr. Olive. I was ready then and I did shoot Mr. Olive. I said that I think he had got part of his shot. I was shooting at Mr. Olive anywhere I could see him. Mr. Olive's face was turned just like mine is now. He was coming just like I said, him and Mr. Wagnon, side by side. Olive could not have been facing me when I shot the first shot, because Bud Wagnon was between me and him, and if Mr. Olive turned in his seat I don't know it. After Wagnon got out of my sight it looked like Olive was trying to shoot because he was triangled this way. I did not shoot at Mr. Olive until Mr. Wagnon fell, and I could not directly shoot at him until them. Mr. Wagnon had fell over backward, back over the seat, and then I shot at Mr. Olive. Q. Was he facing you then? A. No more than this; was trying to use his gun."

1. The case was tried from its incipiency to its close upon the general theory that Olive and Wagnon were making common cause against appellant in whatever they did against him with reference to the prosecution, threats and kindred matters. The prior transactions between appellant and Wagnon and appellant and Olive, and their common enmity towards appellant permeate this entire record. It is a part of the State's case, and part of the appellant's case. These matters entered into the trial of the case from its beginning to its end, and gave coloring to the facts, whether viewed from one standpoint or the other. So that the case can not be viewed intelligently or fairly from any other standpoint. The State's theory, as before stated, was that in view of this condition appellant lay in wait for the two antagonists or intentionally placed himself in position where he could kill them. Appellant's theory was that he had to arm himself thoroughly to protect himself upon an accidental meeting against an attack of either or both, and that in going to the mill for the purpose of 'phoning the sheriff, the meeting was purely acci-

dental, and that he tried to avoid the difficulty by getting off the road so that his enemies might pass and no difficulty ensue.

Charging the jury the court submitted all issues of the case and the law of murder upon the theory that the difficulty alone occurred between Wagnon and appellant, except at the close of the charge on self-defense the jury were instructed as follows:

"If the jury believe from the evidence that it reasonably appeared to the defendant at the time of the killing that the deceased F. T., or Bud, Wagnon, and Jim Olive, were acting together viewed from the standpoint of the defendant and that Bud Wagnon or Jim Olive made a demonstration to shoot the defendant with a gun, then the jury are instructed that the defendant had a right to shoot and to continue to shoot until all danger as it reasonably appeared to defendant was passed, and in this connection you are charged that in no event was the defendant bound to retreat in order to avoid the necessity of killing the deceased."

If he had a right to defend against both, the jury should have been plainly told so, and if they were acting together in seeking to take his life, and that under those circumstances he had a right to the law of self-defense against both as much as he would against either, and that he had a right to kill both, or at least to continue shooting until all danger had reasonably ceased from either or both of them. This phase of the charge which undertakes to authorize appellant to defend against the attack of two was not sufficient and fell far short of the law applicable to the circumstances attending the tragedy. Nowhere else in the charge does the court undertake to instruct the jury as to appellant's right to defend against the combined attack of the two deceased. The court charges upon the law of threats, but in giving that charge he limited it to the threats made by deceased Wagnon. Where threats are in the case the defendant is entitled to a charge under the law of self-defense as against the threats under the act or demonstration or threatened demonstration on the part of his assailants as a part of self-defense independent of the general charge in regard to self-defense. McMichael v. State, 49 Texas Crim., 422; Swain v. State, 48 Texas Crim. Rep., 98. The Swain case has been followed in all subsequent cases, and in fact this law is settled by the statutes. Error was assigned upon this phase of the charge, among other things, in that it limited the right of appellant's self-defense against the threats and demonstration on the part only of Wagnon. This was an important matter. Appellant's testimony made it more apparent than did that of Chadwick, the State's witness, but Chadwick testified that before the tragedy he saw both of the parties in the wagon get their guns from under the cover of the wagon-sheet and lay them across their laps; that one of them, Wagnon, "had the stock up sorter under his arm, like along across his leg that way." This witness said he could not tell exactly how Olive had his gun, because it was in front of him,

and he could not see between them. Olive was on the right side and Wagnon on the left as they sit in the wagon. This witness further says: "I was right along with them till they turned their back to get the guns. I taken it to be a wagon-sheet, and I never examined it to see what kind it was. They had their guns covered with the wagon-sheet, for I didn't see the guns till they got them out. They hadn't quite got to the bottom when they got their guns—didn't stop the horses—while the wagon was going on they uncovered the guns. Mr. Wagnon uncovered the guns. I seen him pick up one of them and Mr. Olive reached and got his. When Mr. Olive reached back and got his, he put it on his lap, I reckon, and I could not see it any more. It looked to be a medium length gun, and after he reached back and put it over in his lap I could not see it any more because he was sitting up there driving. I was behind them when they reached back and put the gun in front of him—twelve or fifteen feet—and he put it in his lap, and Mr. Olive put his just like I showed you with that crutch." Further testifying about this, speaking of the embankment road that had been thrown up from the foot of the hills to afford a roadway when the creek had an overflow, the witness said: "That rockway is over there in little Cypress. I call it a rockway—made for wagons to travel on in high water in Cypress bottom, and it extends from the foot of the bridge to the foot of the hills across the bottom, and that rockway is pretty near a quarter of a mile long. I traveled along with them until we got pretty near to the rockway, and then they reached back and turned a sheet of some kind back and picked up their guns and I dropped back a little piece behind them. That was before they had gotten into the bottom, about 100 or 125 yards before they got on the rockway. Then I traveled between thirty and thirty-five yards behind the wagon—they did keep driving, just walking along and I was on my pony behind them." At this point he made the statement that Wagnon had the stock of his gun up under his arm. Appellant testified in this connection that when they discovered him that they made a demonstration to elevate their guns and he fired, using an automatic shotgun, and if they had not made a demonstration he would not have fired. That he left the public road where he was traveling in order to avoid meeting them. Under this state of case, in view of the numerous threats that had been made by the deceased parties, the court was in error in not submitting to the jury the law applicable to the threats and demonstration of both parties viewed from that theory of self-defense.

2. Again, the court gave in charge to the jury the law applicable to manslaughter. There is a contention by the State that manslaughter was not in the case. It is sometimes difficult to tell whether manslaughter, under a given state of facts, is in the case or not, but wherever that question arises the doubt should be solved in favor of the accused and the charge on manslaughter given. This matter

was, to some extent, discussed in Brown v. State, 54 Texas Crim. Rep., 121, where that doctrine was laid down. That rule is, however, the correct one, and followed in the decisions in this State.

If appellant waylaid his adversaries for the purpose of killing them as they passed along the public road and did kill them, he was guilty of murder in the first degree. Any mention of murder in the second degree we deem unnecessary here to discuss. If appellant accidentally met the parties in the road and to avoid trouble with them and of being killed himself, or being instrumental in bringing about a fatal trouble, in view of the transactions and matters occurring before, left the road and went thirty-five to fifty yards away to a tree in the bottom, and the deceased parties when they saw him had their guns and one or either made a move as if to raise the gun and appellant fired, the issue of manslaughter is suggested. Suppose the jury should believe that they did not intend to kill appellant, but anticipating trouble with him, they had prepared themselves in advance to resist any attack he might make, and they were passing along near him and at an unfortunate time raised the gun without seeing him, and he fired and killed them; or suppose they did not in fact raise the gun at all, but had the gun in the position described by the witness Chadwick, and he shot and killed, and before they had made any such overt demonstration as the jury might believe would indicate they intended to execute their threats or to kill appellant? This would suggest the issue of manslaughter. It is, as before stated, sometimes a difficult matter to draw the line of demarcation between manslaughter and self-defense as to where one ends and the other begins, but if the lines are not well marked and it is difficult to tell, then the law of manslaughter should be given. As was said in the Brown case, supra:

"In other words, the right of appellant to resist the attack or anticipated attack by two antagonists, under the circumstances, would be as cogent from the theory of manslaughter as it would be from the standpoint of self-defense, provided, however, that he believed that such attack was made for the purpose of inflicting chastisements causing pain or bloodshed. The court recognized this doctrine as applicable to the law of self-defense, and so charged the jury, coupled with the further proposition that his life must be in danger or his body of serious injury in order to justify the killing. It is sometimes a little difficult to draw the line, where the question or serious bodily injury is involved, between self-defense and manslaughter, and where these propositions are in the case, the court should definitely instruct the jury so that they will understand where one ends and the other begins, and be able to draw the line of demarcation from the facts. So it is clear, as we understand the facts and the law, that if Johnson alone provoked the difficulty with a view of inflicting severe chastisement, as developed by the facts, upon appellant, he would have the legal right to have this phase of the law submitted

as bearing upon manslaughter. If appellant, under the circumstances, thought the deceased was bringing on the difficulty to be joined in by Miller, and that the difficulty was to proceed upon the theory of both of them giving him a beating, he had the right to have the law of manslaughter charged from this standpoint." Again, it was said in the same opinion: "As before stated, the court recognized the doctrine of self-defense from the attack or anticipated attack of the deceased and Miller, but did not instruct the jury in regard to this phase of the law as applicable to manslaughter."

In the hurried and rapidly transpiring of events in a deadly conflict, as this record shows this to have been, the participants have not the time to sit down and calmly calculate the facts and environments as the jury does in the light of subsequent events or at a time remote from the tragedy. Appellant's life had been threatened by both of the deceased parties, who were shown to have been determined men, and who would execute threats when made. From his viewpoint of it he was afraid of them; so much so that he failed and refused to attend his trial for carrying a pistol where the two men were witnesses against him. That accidentally on the same evening he met and gave them the road and turned to a place of safety. As they approached they were armed with their guns in position for ready use. There were two against him. In this condition of the case the mind would be easily excited beyond capability of cool reflection. The slightest movement on their part, under the strained circumstances, whether innocent or intentional, might have a tendency to inflame, terrorize or enrage appellant's mind to such an extent that it would be incapable of cool reflection, and place the facts in such condition that the law of manslaughter was demanded. We do not view this case from the standpoint of the deceaseds, but from the standpoint of the appellant. It is his mind, his purpose and his intention that were to be weighed by the jury, and they must look at it as he looked at it and as he understood the situation. The jury, in the light of events transpiring at the trial, with all the testimony that had been gathered together before and after the homicide in front of them, might have thought that appellant had no right to view the matter as he claims that he did view it, but that is not the criterion. The rule is, that it must be viewed from the standpoint of the defendant as he viewed it at the time of the transaction. He may be guilty of a cold blooded assassination and the jury found the facts against him, but that does not change the rule of law which is as old as our jurisprudence, that every defendant on trial for his life or liberty is entitled to a charge from his viewpoint of the case. The State has the right to have that side of the case presented, but the appellant has also the legal right to have his side of the question legally and fairly presented.

This case presents three questions where a charge should have been given to the jury to the effect that appellant had the right, first, to

defend against apparent danger as against both of the deceased parties; second, he had the legal right to have the law of threats charged favorably to him as against both the deceased parties; third, he had the right to have manslaughter charged to the jury, from the acts of both parties not only occurring at the time, but having occurred previously and shedding light on the occurrences at the time of the homicide as adequate cause to render his mind incapable of cool reflection. The court did not so charge. The whole case involves the action of both parties and their acts can not be segregated.

3. The court charged the jury in regard to self-defense, among other things, as follows: "In every case in determining whether the defendant acted from a reasonable expectation or fear of death or serious bodily injury from the deceased, it is proper for the jury to take into consideration the relation of the parties, relative size and strength of the parties, and previous conduct, declarations or threats, if any, of the deceased, and all other circumstances, if any, in the case." This charge limits, as did the other charges, these matters to the deceased Wagnon, as his was the only name mentioned in the indictment. Error is also assigned against this charge because it required the jury to take into consideration the relative size and strength of the parties. There are several decisions holding that in a case like this such charge is error. Hickey v. State, 45 Texas Crim. Rep., 297; Brady v. State, 65 S. W. Rep., 521; Warthan v. State, 41 Texas Crim. Rep., 385; Bracken v. State, 29 Texas Crim. App., 362; Steagald v. State, 22 Texas Crim. App., 464; Hackett v. State, 13 Texas Crim. App., 406. There are quite a number of other cases, but these are sufficient to illustrate the rule. It is not always error to give a charge with reference to the relative size and strength of the parties, but the character of case where such charge is authorized will readily suggest itself. If a larger party is engaged in a personal encounter with a smaller man, upon trial it would be a fact in his favor, that his antagonist was a larger and stronger man and one more athletic, but that rule does not apply where men are shooting at each other. Under the facts of this case these men were from thirty-five to fifty yards apart. All of them were thoroughly armed and equipped for the most deadly encounter. The deceased Wagnon had a Winchester; Olive had a gun, as did appellant. In fact, appellant seems to have had two guns. We do not understand how, under the circumstances stated, that the relative strength or size of the parties to this combat could be a criterion of appellant's self-defense. It was an unnecessary abridgement of his right and under the circumstances detailed should not have been given. Any of the parties were sufficiently large and strong to handle and fire a gun. A double-barrel shotgun or a Winchester rifle may be as fatally used in the hands of a very small man as in the hands of an athlete. While this question may not always be cause for reversal, yet charges of this character should not be given in cases

like the one in hand.  In some cases it would be beneficial to give
a charge of this character for the defendant.  In others it may be
very detrimental, for the jury might understand that if appellant was
a larger man that the accused, his right of self-defense might be
abridged by reason of his strength and size, although they were fifty
yards apart and firing at each other with double-barrel shotguns or
Winchesters.

4.  It is insisted that the court was in error in refusing and failing
to give in charge article 676 of the Penal Code.  This article reads
as follows:  "When the homicide takes place to prevent murder,
maiming, disfiguring or castration, if the weapons or means used
by the party attempting or committing such murder, maiming, dis-
figuring or castration are such as would have been calculated to
produce that result, it is to be presumed that the person so using
them designed to inflict the injury."  The facts in this case call for
a charge under this statute.  It is made a legal presumption, or as
some of the decisions put it, an absolute presumption of law that
the design of the deceased was to inflict the injury indicated, and
it is further held that this presumption is imperative to juries as
well as to courts, and when applicable must be given in charge to
the jury.  This question was thoroughly adjudicated and announced
in Kendall v. State, 8 Texas Crim. App., 569, and has never been
questioned so far as I am aware.  That the weapons in the hands of
the deceased parties were deadly, is not debatable.  That they had
put them in position for use is not to be questioned, for this was
proved by the State.  That demonstrations had been made by them
is shown by the evidence.  Whether the court believed appellant's
testimony or not, it was before the jury as evidence and appellant
was entitled to a charge on this statute.  He properly reserved his
exception in motion for new trial.

I wish to close this dissenting opinion with an extract from the
opinion of Judge Clark in the case of Rothschild v. State, 7 Texas
Crim. App., 519:

"Courts can not be too careful, especially in trials of the graver
felonies, in awarding to defendants the full measure of their rights
under the law, and in restricting the prosecution within the limita-
tions enjoined by law.  The State in her wisdom and humanity has
placed guarded restrictions around the trials of her citizens, and has
guaranteed to them the enjoyment of certain rights and privileges,
even though they stand under grave accusations for a violation of
her laws.  And when she comes into her own courts, in the person of
her law-officer, and demands the forfeiture of the life or the liberty
of the citizen, she is entitled to no more favor or consideration than
the humblest citizen in the land.  Such is her own law, and she would
not change it if she could."

A fair trial is guaranteed to the accused, guilty though the State's
evidence may show him, and guilty though he be from that stand-

point, yet he is entitled to a fair presentation of the law applicable to the facts introduced on the trial. The State is claiming the life of the appellant, and from the standpoint of the State's case with show of reason. Viewed from the standpoint of appellant, it was an accidental meeting with two determined, bitter enemies who had threatened his life, and replying to offers of reconciliation made by him, stated they would only settle their difference in no other way than with a deadly missile discharged from firearms. In this condition of the case he met these antagonists. He gave them the public road, turned to one side, and as they approached him they made preparation to carry their threats into execution, and under those circumstances he fired in defense of his person. His enemies were both armed with guns. The State's witness Chadwick supports appellant's testimony to the extent of showing that some 125 yards or such a matter before reaching the point where the tragedy occurred they had uncovered their guns from the wagon, Olive placing his gun across his lap, and Wagnon placing his with the stock of the gun under his arm. Chadwick was unaware that they had the guns until he saw them uncover them. With their guns in this position appellant met them coming down the public road, and to avoid a deadly conflict with them turned away. The jury may not have believed this and did not. The trial court evidently discounted it. My brethren, in their opinion discounts it, and it occurs to me that appellant's matters, viewed from the standpoint of the charge, have been minimized because of the fact that his testimony has been discredited by those who have been called to try and pass upon his case, and not because the evidence does not raise the issues. As I stated in the beginning of this dissent, no candid reader can read this record without discovering the fact and reaching the conclusion that the action of these two men was that of one man. They were brothers-in-law. Their enmity was a common enmity against appellant. They made threats against his life; refused reconciliation; they were together, both armed, and, under appellant's testimony above, both were making demonstrations to fire. Under these circumstances this charge fails to submit the law of the case. There is no point in the record that fails to show that these two deceased parties were acting together. If appellant went for the purpose of waylaying them, he did it knowing that he had two antagonists. If it was an accidental meeting, the two antagonists were in front of him armed with deadly weapons. They both moved at the same time, making demonstrations with their guns, yet appellant has been tried on every issue of this case except an incorrect charge in regard to a perfect right of self-defense at the very heel of the charge, as if he only had legal rights against Wagnon. Manslaughter was thought to be in the case by the trial judge, and he charged it from the standpoint alone of killing Wagnon. Threats were in the case made by both of them. They

were acting together, yet the charge only submits the right of self-defense against the threats of Wagnon. The self-defense was against both, and yet the court after giving the charge on self-defense as against Wagnon, at the end gives a charge, which has been discussed, seeking to link the two together alone from that standpoint of the case. However much the court may discredit the evidence for the accused, this will not justify failure to properly submit the issues in the charge.

I dare say that the reports of this State are such that this case will stand isolated and alone in holding that a general charge on the law of self-defense against apparent or real danger supplies the place of the legal presumption arising from the use of deadly weapons, as provided in article 676 of the Penal Code. All the decisions where that question has even come before the court have laid down the rule and it is statutory that it is fatal error to a conviction that it has not been given when deadly weapons are used by the deceased, the issue being self-defense. I have thought and still think that a party charged with crime is entitled to a fair, affirmative presentation of the issues that are favorable to him when the State is undertaking to take his life or liberty at the hands of the jury. This man has not had that character of trial. I therefore can not agree with my brethren in affirming the judgment.

### ON REHEARING.

#### June 23, 1911.

HARPER, Judge.—At a former day of this term this case was affirmed, and appellant has filed a motion for a rehearing in which he insists that in the dissenting opinion, Judge Davidson takes the correct view of the propositions involved. We have carefully gone over the record again, and on the proposition that manslaughter is in the case and should have been properly submitted to the jury, we can not agree. It is unnecessary to again state the facts, for, while Judge Davidson says he can not agree to the statement of facts contained in the opinion of the court, yet, to take the facts as he states them in the dissenting opinion, there is no phase of the testimony which would present the issue of manslaughter, for if, as defendant says, Wagnon raised his gun as if preparing to shoot, this presented self-defense, and not manslaughter, for there is no testimony in the record that defendant was frightened, suddenly enraged, or gives any ground to suppose the theory that he was in that condition of mind upon which manslaughter is predicated. In the case of Massie v. The State, 30 Texas Crim. App., 64, Judge Davidson, speaking for the court, lays down the rule: "There must not only exist the adequate cause coupled with the defendant's knowledge of its existence, but the disturbed condition of the mind and the necessary 'passion' must also exist in order to reduce the killing from murder to

manslaughter. . . . In the absence of the *'passion'* that reduces a homicide to manslaughter, the unattended 'adequate cause' may become evidence of the most cogent force showing the antecedent malice on the part of the slayer. In such case the 'adequate cause' unattended by the necessary 'passion' rendering the mind incapable of cool reflection, instead of constituting an extenuation of the crime, may and would become an aggravating circumstance attending the commission of the offense." There is no indication in the testimony that defendant was in a 'passion,' but everything indicates that condition of mind upon which murder is predicated, if the defendant is guilty of any offense.

Again, in the case of Miller v. The State, 31 Texas Crim. Rep., 609, in speaking for the court, Judge Davidson said: "The question at last is, what cause, reason or motive actuated the defendant in committing the homicide? It is the settled law of this State, that in arriving at a correct conclusion in homicide cases, the killing should be viewed from the defendant's standpoint; that is, to ascertain as nearly as possible, from the evidence, the reasons and motives which moved or induced the accused to do the killing. It has been held that an unlawful arrest is esteemed in law, a great provocation. If it be conceded that such provocation constitutes 'adequate cause,' under our statute then, in order to reduce the killing to manslaughter, 'sudden passion' must have existed in the mind of the slayer at the time of the homicide; otherwise, the killing would be murder. Massie v. State, 30 Texas Crim. App., 64; Ex parte Jones, ante, 31 Texas Crim. Rep., 422; Ex parte Sherwood, 29 Texas Crim. App., 334; Miller v. The State, 32 Texas Crim. Rep., 319, 20 S. W. Rep., 1103. Such provocation, in the absence of 'sudden passion,' may become evidence of a most cogent character and force, showing malice." If anyone can read the record, even as stated by Judge Davidson in his dissenting opinion, and find any evidence of "sudden passion," or any other emotion of the mind that would reduce the case to manslaughter, it is more than we have been able to discover.

Again, in Ex parte Jones, 31 Texas Crim. Rep., 422, this court says: "The law recognizes the uncontrollable power of sudden passion as the cause of homicide, when this sudden passion arises upon a provocation which would commonly or naturally arouse the passion or sudden resentment of a person of ordinary temper to such a degree as to render the mind incapable of cool reflection. It is to be observed that this passion is sudden, uncontrollable, and flaming up from the injury or insult, and the homicide must occur before there is reflection or composure. Our Code defines and describes the character of the passion that reduces homicide to manslaughter as 'sudden passion.' "

And also Hall v. The State, 33 Texas Crim. Rep., 536, the following language is used: "The proposition contended for is apparently based on a misunderstanding of the term 'malice' as used in law,

which does not necessarily involve a vicious and wicked motive, but is applied to any wilful transgression of law. Law is practical. It deals with material facts, rather than with immaterial ones. It therefore regards not so much the act of killing as the particular manner or modes of killing, which must always be alleged and proved. Whart. Crim. Ev., 738. It is from circumstances attending the killing that malice is inferred, without reference to the actual or precise motive, whether of hatred, fear or gain, with which the act was done. In fact, in cases of homicide, motive of any kind is usually shown to throw light upon the condition of the mind at the time when the crime was consummated or determined upon; for the question in every homicide is, what was the condition of defendant's mind? Was it calm and sedate, and with a formed design? and not, what particular motive led to such design? A motive to take life, however powerful, which does not render the mind incapable of cool reflection, can not reduce a deliberate homicide below murder in the first degree. Indeed, if motive is to govern in determining the degree of crime, it would make no difference how deliberately or cruelly the killing was effected, whether by lying in wait, by poison, starving, or torture, which by our Code and by all law is held to be murder upon express malice; and there would be no homicide which might not be reduced to murder in the second degree, or even be at the mercy of cowardice and perjury, and the floodgates of crime thrown wide apart."

In this case the evidence, as quoted in the original opinion or in the dissenting opinion, shows that appellant upon seeing deceased driving up the road, stepped to the side of the road, set one gun down by a tree, with the other in his hands, he saying if they drove on by he did not intend to harm them, or either of them; but when they got near, Wagnon undertook to raise his gun, and when he did, he fired. This evidences coolness, deliberation and a state of mind foreign to any condition upon which manslaughter can be predicated, and, as said by Judge Davidson in the dissenting opinion, we will now say, "We dare say that the reports of this State are such that the dissenting opinion in this case will stand isolated and alone in holding that manslaughter can be predicated upon such a condition of mind as appellant's testimony would indicate." We have searched the books and we can find none. Ward v. State, 59 Texas Crim. Rep., 62; Jirou v. State, 53 Texas Crim. Rep., 18; Lentz v. State, 85 S. W. Rep., 1068; Eggleston v. The State, 59 Texas Crim. Rep., 542, 128 S. W. Rep., 1105. And in Canon v. State, 59 Texas Crim. Rep., 398, Judge Davidson, in speaking for the court says: "We are of opinion that the question of manslaughter is not in the case. Appellant makes a clear case of self-defense. The State makes a case of waylaying with antecedent preparations, former grudges and all indications and indicia of murder. If the State's evidence is to be credited, and the jury did believe it, it was a killing upon prepara-

tion and lying in wait. The evidence for appellant shows that he met his antagonist unexpectedly, and was informed by him his day of living was ended; that his time was up, and that deceased immediately drew his pistol and fired. We do not believe there are any facts which required the court to charge on manslaughter under this state of case. If appellant's testimony is to be credited, he had a case of self-defense, and the jury, believing his testimony, should have acquitted." This is the last case in which we find our presiding judge drawing the distinction until in the dissenting opinion in this case and in the Canon case and other cases quoted herein his views appear wholly at variance with those now expressed.

Again, it is insisted that the presumption in article 676, Penal Code, should have been given. When the court in his charge tells the jury if "the deceased was in the act of making an unlawful attack upon the defendant with a gun," he should be acquitted, is he not presenting the presumption in as strong language as possible? What is the difference between telling the jury "if deceased made an unlawful assault with a gun, the law presumes he intended to kill, and you will acquit the defendant," and telling them "if deceased made an unlawful attack with a gun, defendant should be acquitted?" That is couching the presumption in very effective language and in language none can misunderstand. And in presenting the theory upon which defendant should be acquitted, this presumption is presented in the most favorable light to defendant, and the form used in presenting self-defense has been approved so often by this court, it seems useless to cite authorities. But see the charge copied in the opinion and Purdy v. State, 60 Texas Crim. Rep., 130, 131 S. W. Rep., 561; Pratt v. State, 59 Texas Crim. Rep., 167; Jay v. State, 56 Texas Crim. Rep., 111; Puryear v. State, 56 Texas Crim. Rep., 231. These authorities set out the charge approved, and upon examination the charge on ·self-defense in those cases will be found to be almost in terms of the charge in this case. In a well considered opinion, Davis v. State, 28 Texas Crim. App., 542, Judge Hurt says:

"If such a charge is not excepted to at the time of trial, but is presented in a motion for new trial, which is the next point at which it could be presented, then its consideration by this court would be subject to another and a very different rule, which would be whether or not such charge was an error which, under all the circumstances, as exhibited in the record, was 'calculated to injure the rights of the defendant,' and which is prescribed as one of the grounds for the granting of a motion for a new trial, in the following language: 'Where the court has misdirected the jury as to the law, or has committed any other material error calculated to injure the rights of the defendant.'

"Of what degree of force must the evidence be that tends to establish an offense, or tends to mitigate the offense charged, in order to require a charge applicable thereto? Chief Justice Roberts says that

if its force is deemed to be very weak, trivial, or light, and its application remote, 'the court is not required to give a charge upon it.' 'If, on the other hand, it is so pertinent and favorable as that it might be reasonably supposed that the jury could be influenced by it in arriving at their verdict, the court should charge so as to furnish them with the appropriate rule of law upon the subject.' Bishop v. The State, 43 Texas, 390. Hence, unless the evidence tending to present a less degree of an offense, or any theory of defense, be so pertinent and forcible that it might be reasonably supposed that the jury could be influenced by it in arriving at their verdict, a failure of the court to charge thereon would not be ground for reversal in the absence of exceptions.

"This position is in exact harmony with the first opinion in this case, and in accord with Bishop's case, supra, and a number of cases decided by this court, notably Cunningham's case, 17 Texas Court of Appeals, 87; Elam's case, 16 Texas Court of Appeals, 34, and Leeper's case, 61 Texas Crim. Rep., 129, decided at the present term, but not yet reported. See also Johnson's case, 27 Texas, 758.

"Loose expressions upon this subject can be found in the opinions of this court, but the principle is well settled and is absolutely correct, whether this court has always adhered to it or not, that in the absence of exceptions to the charge of the court, for this court to reverse, the evidence tending to present a phase of the case or theory favorable to the accused must be so pertinent and favorable that it might reasonably—not possibly—be supposed that the jury could be influenced by it in arriving at their verdict. Unless the evidence be of such a character no injury appears, no injury is probable—not possible, but probable—and unless this appears, there is no ground for reversal; and to reverse in the absence of probable injury would be contrary to principle." See also Godwin v. State, 39 Texas Crim. Rep., 404; Wright v. State, 40 Texas Crim. Rep., 45, and other cases cited in the original opinion.

In an opinion recently handed down by our eminent presiding judge, we are referred to Judge Hurt and Judge Roberts as two of the most eminent jurists who ever graced the bench in this State, and to which we acceded, and in this case if it should be conceded that there were some slight omissions in the charge, when the principle is announced in other language, and no possible injury could have possibly resulted to appellant, to reverse would be "*contrary to principle,*" so says Judges Hurt and Roberts.

The only other ground insisted on for a rehearing is that the charge on self-defense in each paragraph where deceased's name is used "or Olive" should also appear, and it is cited that in the direct examination that appellant always referred to them as "they" and "them" and so coupled their acts and conduct as to render them inseparable. In the original opinion, it is shown that in the cross-examination, he separated them, and did not claim to be able to see

what Olive was doing until Wagnon was shot to death, and a careful perusal of the facts again confirms us in our opinion. But what a play upon words is the contention of appellant? If he "coupled them together," the court fully and explicitly tells the jury that if Wagnon was "doing an act" such as to reasonably lead defendant to believe that he was in danger, he was justified and should be acquitted, and if the jury did not believe Wagnon was doing "any act" under appellant's testimony and the court's charge, upon what theory can it be believed that if the court had instructed the jury that if "Wagnon and Olive" was doing "any act" they should acquit? Wagnon was the man found with the gun in his hands. This is explained by Chadwick, and the fact that he had the gun in his hands, in view of the testimony of Chadwick and the fact that they must pass appellant's house, does not show or induce one to think that Wagnon or Olive, at the time, made any move to do appellant harm. If this arises at all, it arises on appellant's testimony alone, and this the jury rejected as a whole and believed the State's theory that appellant had been lying in wait, behind a brush pile, as evidence by signs of chewing and smoking, footprints, twisting of limbs, to make a blind, etc., as testified to by the witness Cole. The State's case presents a case of waylaying, a cold-blooded assassination, based upon preexisting malice. The defendant contended he acted in self-defense. The fatal wounds, as shown by the testimony of Dr. Allen, is evidence indisputable that neither had their face turned towards deceased when he sent the deadly missiles plowing into their heads and brains, and it is insisted that because in every paragraph of the court's charge he did not couple acts and conduct of Olive with the acts and conduct of Wagnon, although the court did tell the jury that "if it reasonably appeared to defendant that they were acting together, and either Wagnon or Olive made a demonstration" defendant was justified in killing Wagnon, charging the law as appellant insists it should be given in charge, but not at the "place" appellant now insists he would prefer to have had it, although at the time of trial he requested no instructions. As said by Judge White in McDade v. State, 27 Texas Crim. App., 641, if such a construction is to be given, and causes reversed, when every contention of a defendant is submitted in the charge, but not in the exact terms he, in the motion for new trial insists should have been done, "a full floodgate would be given to the most wicked passions, and murder, fearful as it already is, in a tenfold greater degree would stalk through the land, clothed in the panoply of law."

The motion for rehearing is overruled.

*Overruled.*

DAVIDSON, PRESIDING JUDGE.—I adhere to my former views.

DAVIDSON, Presiding Judge (dissenting).—Being unable to agree with my brethren in overruling the motion for rehearing, I wish to make a few observations in addition to what I had to say in the dissenting opinion heretofore filed.

1. This case has been affirmed upon the theory that the majority of this court do not believe the evidence suggested the issue of manslaughter; second, that it was not necessary to charge the law applicable to threats made by both of the deceased parties when they were acting together in their demonstrations against appellant, and, third, that the court did not err in charging the presumption of law from the use of a deadly weapon as provided by article 676 of the Penal Code. Appellant may be guilty of murder in the first degree as found by the jury. With this I have no concern. The weight to be given the evidence and the credibility of the witnesses is confided by our law to the jury and they are made the exclusive judges of both the weight of the evidence and the credibility of the witnesses. This has never been held, however, to relieve the trial court from giving a proper charge on the issues raised by the testimony. Because that court or this court may believe that the accused is guilty of murder in the first degree would not excuse the trial court from charging on the other issues, nor would it relieve this court of discharging its duty in requiring the trial court to properly submit the law applicable to all the issues suggested by the testimony. The trial court in part discharged his duty by applying the law of manslaughter because raised by the facts, but limited the consideration of the jury to the acts only of one of the deceased parties. The evidence is absolutely conclusive that if there was a provocation as to one of the parties it existed alike as to both. The evidence along these lines is sufficiently set out in the original dissenting opinion. Many cases are cited by my brethren and quotations made from opinions written by this court to the effect that where the issues are sharply defined on one side as murder and on the other as self-defense, only that it is not necessary to instruct the jury with reference to the law of manslaughter. That might be stated as axiomatic. If there is no evidence suggesting the issue of manslaughter, of course, it would be wholly unnecessary to charge the law applicable to that question. Quotations from opinions written by myself are given a certain degree of prominence by my brethren for which I express my high appreciation, but they have wrongly applied those decisions. The trouble with the majority opinion on rehearing is that the cited cases do not apply to the facts of this case and only apply to that character of case where the facts exclude manslaughter and only show murder upon one side and self-defense on the other. Those decisions are correct when applied to cases where the evidence excludes manslaugh-

ter.  The trouble here is, my brethren bluntly cast aside all the evidence raising or suggesting the issue of manslaughter and then apply the rule laid down in the quoted decisions in which there was no evidence originally suggesting manslaughter.  If there was no evidence in this record raising or suggesting manslaughter, there would be no cause for dissent in regard to that question.  The trial judge believed, and justly so, that there was evidence requiring a charge on the issue of manslaughter and gave a partial one, limiting it to only one of the parties.  I do not care here to repeat the evidence.  It is sufficiently set out in my original dissent, though not as fully as might have been done from the statement of facts.

2.  That appellant was entitled to a charge on self-defense is conceded, both as to the law of apparent danger and the law of threats. The trial court gave a charge on both issues, but in regard to threats he limited appellant's right of self-defense to such threats as were made by one of the deceased parties, Wagnon.  Threats were made by both of the deceased parties; they were acting together at the time of the homicide; they both made demonstrations and had prepared themselves fully to execute those threats and this was clearly shown by the State's evidence as well as by the defendant's.  I have always understood it to be the law, and the decisions verify my judgment without exception, that the accused has as complete a right of self-defense against both parties as against either when they are acting together against him, viewed from the evidence of threats.  This is true, although the court may have given a charge on self-defense from the standpoint of apparent or real danger. This court has always held that where threats become an issue in the homicide case and relied upon as a defensive matter under the statute, that a charge applicable to such condition must be given, and it is further held as the law that where the court gave a charge on real or apparent danger, it is not sufficient to cover the issue of threats.  It is made prominent in this record by all the evidence touching the question, that both parties had made threats to take the life of appellant.  The State's evidence clearly showed that the deceased parties had prepared themselves to execute these threats. The State's evidence makes this apparent beyond controversy.  That both of them had, within a few hundred yards of where the tragedy occurred, prepared to use their weapons, is shown by the main State's witness, Chadwick; that they made demonstrations is testified by appellant, and sufficiently so to raise the question by Chadwick's evidence.  The deceased, Wagnon, after being shot and killed was found in the wagon with his gun so firmly grasped and held in his hand that it had to be prized or forced out of his hands.  The other deceased party had his gun across his lap and also made demonstrations, shown by the facts.  This evidence clearly raised the issue of threats and demonstrations to execute the threats on the part of both of the deceased parties at the time they were shot by appel-

lant. Under this state of case, appellant was clearly entitled to a charge on the law of threats as applied to both deceased parties. It was not given. Exception was properly taken and the matter timely presented, but my brethren have affirmed the judgment and held there was no error. This is neither right nor legal. If anything has been settled in Texas, beyond controversy, it is that when an accused is placed on trial for life or liberty, he has a legal right to a charge on all the facts introduced which presents the case favorably to him. It is not right nor legal to confine him in his case to a partial presentation of the law.

3. The court gave a general charge on self-defense viewed from the standpoint of apparent danger, but did not instruct the jury on the presumption of law provided by article 676 of the Penal Code. That article reads as follows: "When the homicide takes place to prevent murder, maiming, disfiguring or castration, if the weapons or means used by the party attempting or committing such murder, maiming, disfiguring or castration are such as would have been calculated to produce that result, it is to be presumed that the person so using them designed to inflict the injury." My brethren hold that the charge on apparent danger from the acts or words, coupled with the acts of the person killed, if those acts and words showed it was the purpose and intent of such person to kill, the same as article 676 just quoted, was and is sufficiently given under article 675 to cover the requirement of article 676. The law of apparent danger under article 675 has never heretofore—so far as I am aware—been confounded with the law as laid down in article 676. Under article 675, if it appears to the accused that the deceased by his acts or words or both, intended to kill, he had the right to defend if he understood the facts to show that his life was in danger or if he were in danger of serious bodily injury. This covers apparent danger and article 679 of the Penal Code says that he would be justified if these acts produced a reasonable expectation or fear of death or some serious bodily injury. Whenever those circumstances occur and the accused killed, he is justified upon the law of apparent danger, but article 676 says that where deceased uses weapons or means which were calculated to produce either murder, maiming, disfiguring or castration, the law absolutely and conclusively presumes that the person using them designed to inflict the injury. There is a wide distinction under these statutes between a conclusion to be reached from the viewpoint of appellant that his life was in danger, and the legal presumption favorable to the defendant, in addition to that under apparent danger that the law presumes conclusively that the attacking party intended to kill or inflict serious bodily injury. How these statutes can be confounded or upon what reasoning they can be held to mean the same thing, is not clear to the mind of the writer. These questions underwent a thorough investigation and decision in Kendall v. State, 8 Texas Crim. App., 569, and the doctrine was

there laid down that when the homicide was done to prevent, murder, maiming, disfiguring, or castration, and the weapons or means used by the aggressor was calculated to effect his purpose, this article makes it an absolute presumption of law that his design was to inflict the injury indicated. It is further held that this legal presumption is imperative to juries as well as to courts, and, when the facts called for the charge, it must be given to the jury. It was also held in Jones v. State, 17 Texas Crim. App., 602, and Cochran v. State, 28 Texas Crim. App., 422, that where the weapon and the manner of its use were such as calculated to produce either death or serious bodily injury, then the law presumes that the deceased intended to murder or maim the defendant and the jury should have been so instructed in affirmative explicit terms. If there has been a decision to the contrary until the decision written in this case by my brethren, it has escaped my attention. There has been some little differences as to what it took to constitute a deadly weapon, but there has never been any difference in the court that if a deadly weapon was used that the legal presumption was conclusive on the jury and the court. In addition to Kendall case, supra, I collate the following cases: McMichael v. State, 49 Texas Crim. Rep., 422, 93 S. W., 723; Ward v. State, 30 Texas Crim. Rep., 687; Hall v. State, 43 Texas Crim. Rep., 479, 66 S. W. Rep., 783; Scott v. State, 46 Texas Crim. Rep., 315, 81 S. W. Rep., 950; Clark v. State, 56 Texas Crim. Rep., 293, 120 S. W. Rep., 179. I make this quotation from the opinion in Clark v. State, supra, written by Judge Ramsey, when a member of this court:

"The court erred in not giving in charge to the jury the substance of article 676 of our Penal Code of 1895. This article is as follows: 'When the homicide takes place to prevent murder, maiming, disfiguring or castration, if the weapons or means used by the party attempting or committing such murder, maiming, disfiguring or castration, are such as would have been calculated to produce that result, it is to be presumed that the person so using them designed to inflict the injury.' In this case the weapon used by White was a pistol used as a firearm. In respect to the use of a deadly weapon, it has been the uniform holding of this court, since the case of Kendall v. State, 8 Texas Crim. App., 569, that the court must give in charge to the jury, the substance of this article of our Penal Code. We have recently discussed this matter at great length in the case of Renow v. State, 56 Texas Crim. Rep., 343, 120 S. W. Rep., 174. See also Jones v. State, 17 Texas App., 602; King v. State, 13 Texas Crim. App., 277; Cochran v. State, 28 Texas Crim. App., 422; Ward v. State, 30 Texas Crim. App., 687; Yardley v. State, 50 Texas Crim. Rep., 644, 123 Am. St. Rep., 869." In this particular case the two deceased parties were armed—one with a Winchester and the other a shotgun. If these were not deadly weapons, I do not know what it takes to constitute a deadly weapon. That it is shown in the

record that they were attempting to use them is uncontroverted. If the statute, article 676, Penal Code, is ever worth anything to an accused party when he is on trial for his life, it occurs to me that the accused in this particular case was entitled to its full benefit. He has been convicted of murder in the first degree. My brethren say self-defense was in the case and so cogently that it excluded manslaughter, and yet they affirm this case and deny appellant the legal right of a charge on the plainly written statute which guarantees him unqualifiedly the right that the jury be told that if the parties were armed at the time and were seeking to use such arms and they were deadly, he had a right to have the jury instructed that the law presumed that they intended to kill him. The statute takes away any option from the jury and the court and makes it a conclusive presumption. This legal presumption does not arise under article 675 and was never held before to be suggested by article 675.

I therefore believe, however guilty the court may believe a man or however just the verdict of the jury may be, if the trial court has ignored favorable issues in instructing the jury in regard to the law of the case that might have brought about a more favorable result in his conviction, the error is reversible. I, therefore, enter my earnest protest against the affirmance of this judgment